**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| STATE OF NEW MEXICO, EX REL., RAÚL TORREZ, ATTORNEY GENERAL,<br><br>        Plaintiff,<br><br>    - v. -<br><br>META PLATFORMS, INC.; INSTAGRAM, LLC; META PAYMENTS, INC.; META PLATFORMS TECHNOLOGIES, LLC; and MARK ZUCKERBERG,<br><br>        Defendants. | Civ. No. 1:23-cv- 01115 DLM-KK |

## META'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

LEGAL STANDARD............................................................................................... 4

ARGUMENT ........................................................................................................... 5

I.     THE STATE FAILS TO PLEAD FACTS SUFFICIENT TO ESTABLISH
PERSONAL JURISDICTION........................................................................... 5

     A.    Meta Is Not Subject to General Jurisdiction in New Mexico. ................ 5

     B.    Meta Is Not Subject to Specific Jurisdiction in New Mexico................. 5

          1.    The Complaint Fails to Allege That This Case Arises Out of or
Relates to Meta's Contacts in New Mexico............................... 6

          2.    New Mexico Users' Interactions with or Alleged Harm from
Meta's Services Cannot Establish Personal Jurisdiction. .......... 7

II.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS THE
STATE'S CLAIMS. .......................................................................................... 9

     A.    Meta Is an Interactive Computer Service Provider................................ 11

     B.    The State Seeks to Hold Meta Liable as a "Publisher or Speaker." ...... 12

     C.    The State's Claims Treat Meta as the Publisher of Third-Party Content. ............ 18

III.   THE FIRST AMENDMENT BARS THE STATE'S CLAIMS SEEKING TO
HOLD META LIABLE FOR ITS CONTENT POLICIES. ............................... 19

IV.   THE STATE CANNOT ESTABLISH THE ELEMENTS OF A PUBLIC
NUISANCE CLAIM UNDER NEW MEXICO LAW...................................... 22

     A.    The State Cannot Establish an Unreasonable Interference with a "Right
Common to the Public."......................................................................... 22

     B.    New Mexico Public Nuisance Law Does Not and Should Not Apply to
Meta's Alleged Conduct. ...................................................................... 25

V.    THE STATE'S UPA CLAIMS FAIL AS A MATTER OF LAW. ................... 27

     A.    The UPA Exempts Meta from Liability (Counts I, II, & III). .............. 28

B.      The UPA Does Not Apply to Meta's Provision of a Free Service Because
        There Is No "Sale, Lease, Rental, or Loan of Goods or Services" (Counts
        I, II & III). ................................................................................................. 28

C.      The State Fails to Allege Actionable Misrepresentations (Counts I & II)............ 30

D.      The State Has Not Alleged that Any Purported Omissions Were Material
        (Counts I & II). .......................................................................................... 35

CONCLUSION ............................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alario v. Knudsen*,
2023 WL 8270811 (D. Mont. Nov. 30, 2023) ........................................................20

*Allegheny General Hosp. v. Philip Morris, Inc.*,
228 F.3d 429 (3d Cir. 2000) ...............................................................................24

*Anderson v. TikTok, Inc.*,
637 F. Supp. 3d 276 (E.D. Pa. 2022) ..................................................................13

*Andrews v. Stallings*,
1995-NMCA-015, 119 N.M. 478, 892 P.2d 611 (N.M. 1995) .............................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................4

*Ashley Cnty., v. Pfizer, Inc.*,
552 F.3d 659 (8th Cir. 2009) ...............................................................................24

*Azar v. Prudential Ins. Co. of Am.*,
2003-NMCA-062, 133 N.M. 669, 68 P.3d 909 (N.M. 2003) ...............................35

*Estate of B.H. v. Netflix, Inc.*,
2022 WL 551701 (N.D. Cal. Jan. 12, 2022) .......................................................20

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ..........................................................11, 12, 14, 15

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) .............................................................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .........................................................................................4, 31

*Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*,
206 F.3d 980 (10th Cir. 2000) .............................................................................9

*Blessing v. Chandrasekhar*,
988 F.3d 889 (6th Cir. 2021) ...............................................................................6

*Bride v. Snap Inc.*,
2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ........................................10, 14, 18

*Bristol-Myers Squibb Co. v. Superior Court*,
    582 U.S. 255 (2017)..................................................................................................7

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
    861 F.3d 1081 (10th Cir. 2017) ..............................................................................4

*Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
    273 F.3d 536 (3d Cir. 2001)....................................................................................26

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
    208 F.3d 885 (10th Cir. 2000) ................................................................................22

*CGC Holding v. Hutchens*,
    974 F.3d 1201 (10th Cir. 2020) ..............................................................................6

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
    168 F.3d 119 (3d Cir. 1999)....................................................................................22

*City of Chicago v. Am. Cyanamid Co.*,
    823 N.E.2d 126 (Ill. App. Ct. 2005) .......................................................................23

*City of Chicago v. Beretta USA Corp.*,
    821 N.E.2d 1099 (Ill. 2004)........................................................................24, 25, 27

*City of Huntington v. AmerisourceBergen*,
    609 F. Supp. 3d 408 (S.D.W. Va. 2022) .................................................................27

*City of Philadelphia v. Beretta U.S.A. Corp.*,
    126 F. Supp. 2d 882 (E.D. Pa. 2000), *aff'd*, 277 F.3d 415 (3d Cir. 2002)..............27

*City of Sunland Park v. Harris News, Inc.*,
    2005-NMCA-128, 138 N.M. 588 (2005)..................................................................22

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017) ....................................................................12

*Cooke v. Allstate Mgmt. Corp.*,
    741 F. Supp. 1205 (D.S.C. 1990)............................................................................32

*Cullen v. Netflix, Inc.*,
    2013 WL 140103 (N.D. Cal. Jan. 10, 2013), *aff'd*, 600 F. App'x 508 (9th Cir.
    2015) .......................................................................................................................34

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)................................................................................................5

*Dangaard v. Instagram, LLC*,
    2022 WL 17342198 (N.D. Cal. Nov. 30, 2022) ......................................................11

iv

*Daniel v. Armslist, LLC,*
    386 Wis. 2d 449 (2019) ............................................................................10

*Daye v. Cmty. Fin. Loan Serv. Centers, LLC,*
    280 F. Supp. 3d 1222 (D.N.M. 2017) ......................................................29

*DeFilippo v. Nat'l Broad. Co.,*
    446 A.2d 1036 (R.I. 1982) .......................................................................21

*Detroit Bd. of Educ. v. Celotex Corp.,*
    493 N.W.2d 513 (Mich. Ct. App. 1992) ..................................................24

*District of Columbia v. Beretta, U.S.A. Corp.,*
    872 A.2d 633 (D.C. 2005) (en banc) .......................................................27

*Doe #1 v. Twitter, Inc.,*
    2023 WL 3220912 (9th Cir. May 3, 2023) ...............................................15

*Doe II v. MySpace, Inc.,*
    175 Cal. App. 4th 561 (2009) ..................................................................15

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) ..............................................................14, 15

*Doe v. Sch. Dist. No. 1, Denver, Colo.,*
    970 F.3d 1300 (10th Cir. 2020) .................................................................4

*Doe v. Snap, Inc.,*
    2022 WL 2528615 (S.D. Tex. July 7, 2022)............................................17

*Doe v. Twitter, Inc.,*
    555 F. Supp. 3d 889 (N.D. Cal. 2021), *aff'd in relevant part sub. nom.*, *Doe*
    *#1*, 2023 WL 3220912 ............................................................................17

*Does 1-6 v. Reddit, Inc.,*
    51 F.4th 1137 (9th Cir. 2022) ............................................................15, 34

*Dollens v. Wells Fargo Bank, N.A.,*
    2015-NMCA-096, 356 P.3d 531...........................................................30, 35

*Doshier v. Twitter, Inc.,*
    417 F. Supp. 3d 1171 (E.D. Ark. 2019)....................................................9

*Dyroff v. Ultimate Software Grp., Inc.,*
    934 F.3d 1093, 1098 (9th Cir. 2019) .........................................................9

*In re Facebook,*
    625 S.W.3d 80 (Tex. 2021).............................................................14, 17, 18

*Facebook, Inc. v. K.G.S.*,
   294 So. 3d 122 (Ala. 2019) ........................................................................9

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc) ........................................10, 18

*Fed. Trade Comm'n v. Match Grp., Inc.*,
   2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ............................................17

*Fields v. Twitter, Inc.*,
   217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...................................................16

*Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Can.*,
   703 F.3d 488 (10th Cir. 2012) ...........................................................5, 6, 8

*Force v. Facebook, Inc.*,
   304 F. Supp. 3d 315 (E.D.N.Y. 2018), *aff'd in relevant part*, 934 F.3d 53 (2d
   Cir. 2019) ................................................................................................16

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019) ...........................................................12, 14, 17, 19

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) .................................................................32

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
   141 S. Ct. 1017 (2021) .............................................................................5

*Free Speech Coal., Inc. v. Colmenero*,
   __ F. Supp. 3d __, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023) ...............11

*Ganim v. Smith & Wesson Corp.*,
   780 A.2d 98 (Conn. 2001) .......................................................................24

*Georgalis v. Facebook, Inc.*,
   324 F. Supp. 3d 955 (N.D. Ohio 2018) ....................................................8

*Google, Inc. v. Hood*,
   96 F. Supp. 3d 584 (S.D. Miss. 2015), *vacated and remanded on other
   grounds*, 822 F.3d 212 (5th Cir. 2016) ...................................................11

*Greater Hous. Transp. Co. v. Uber Techs., Inc.*,
   155 F. Supp. 3d 670 (S.D. Tex. 2015) .....................................................32

*Gullen v. Facebook.com, Inc.*,
   2016 WL 245910 (N.D. Ill. Jan. 21, 2016) ...............................................8

*Hall v. Bellmon*,
    935 F.2d 1106 (10th Cir. 1991) ....................................................................28

*Harrison v. Facebook, Inc.*,
    2019 WL 1090779 (S.D. Ala. Jan. 17, 2019) ..........................................8

*Herceg v. Hustler Mag., Inc.*,
    814 F.2d 1017 (5th Cir. 1987) ....................................................................20

*Herrick v. Grindr, LLC*,
    765 F. App'x 586 (2d Cir. 2019) ...............................................................18

*Hicks v. Eller*,
    2012-NMCA-061, 280 P.3d 304 .........................................................29, 30

*Hill v. StubHub, Inc.*,
    727 S.E.2d 550 (N.C. Ct. App. 2012) ......................................................10

*Hood v. Am. Auto Care, Ltd. Liab. Co.*,
    21 F.4th 1216 (10th Cir. 2021) ....................................................................5

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, Inc.,
    515 U.S. 557, 570 (1995) ............................................................................20

*State ex rel. Hunter v. Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021) ...................................................................23, 24

*Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*,
    205 F.3d 1244 (10th Cir. 2000) ...................................................................6

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016).........................................................................16

*Johnson v. Arden*,
    614 F.3d 785 (8th Cir. 2010) ......................................................................12

*Johnson v. Gawker Media, LLC*,
    2016 WL 193390 (E.D. Mo. Jan. 15, 2016) ...............................................6

*Johnson v. TheHuffingtonPost.com, Inc.*,
    21 F.4th 314 (5th Cir. 2021) ........................................................................8

*Kimzey v. Yelp!, Inc.*,
    836 F.3d 1263 (9th Cir. 2016) .............................................................17, 19

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ..........................................................11, 12

*Kottle v. Northwest Kidney Centers*,
   146 F.3d 1056 (9th Cir. 1998) ...........................................................22

*L.W. v. Snap Inc.*,
   2023 WL 3830365 (S.D. Cal. June 5, 2023)...............................15, 17

*La'Tiejira v. Facebook*,
   272 F. Supp. 3d 981 (S.D. Tex. 2017) ................................................12

*In re Lead Paint Litig.*,
   924 A.2d 484 (N.J. 2007)...........................................................24, 27

*Lohman v. Daimler-Chrysler Corp.*,
   2007-NMCA-100, 166 P.3d 1091 ...........................................29, 30

*In re Lyft Inc. Sec. Litig.*,
   484 F. Supp. 3d 758 (N.D. Cal. 2020) ...............................................32

*Mark Aero, Inc. v. Trans World Airlines, Inc.*,
   580 F.2d 288 (8th Cir. 1978) ............................................................22

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
   925 F.3d 1263 (D.C. Cir. 2019) ........................................................10

*McCollum v. CBS, Inc.*,
   202 Cal. App. 3d 989 (1988) ............................................................21

*Melea, Ltd. v. Jawer SA*,
   511 F.3d 1060 (10th Cir. 2007) ..........................................................4

*Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) .............................................10, 14, 16

*NetChoice, LLC v. Att'y Gen., Fla. (NetChoice)*,
   34 F.4th 1196 (11th Cir. 2022), *cert. granted*, Nos. 22-277, 22-393 .....................................21

*State ex rel. New Mexico Water Quality Control Comm. v. City of Hobbs*,
   1974-NMSC-064, 525 P.2d 371 ........................................................26

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) .......................................20, 21

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ...........................................................20

*Ralls v. Facebook*,
   221 F. Supp. 3d 1237 (W.D. Wash. 2016)............................................8

*Sekiya v. Facebook*,
2017 WL 3588816 (D.N.M. Jan. 3, 2017) ..............................................................11

*Shiamili v. Real Estate Grp. of N.Y., Inc.*,
952 N.E.2d 1011 (N.Y. 2011) ...............................................................................10

*Shrader v. Biddinger*,
633 F.3d 1235 (10th Cir. 2011) ............................................................................8, 9

*Sills v. Smith & Wesson Corp.*,
2000 WL 33113806 (Del. Super. Dec. 1, 2000) ....................................................27

*Silver v. Quora, Inc.*,
2016 WL 9777159 (D.N.M. June 13, 2016), *aff'd* 666 F. App'x 727 (10th Cir.
2016) ........................................................................................................................14

*Silver v. Quora, Inc.*,
666 F. App'x 727 (10th Cir. 2016) ........................................................................11

*State ex rel. Smith v. Riley*,
1997-NMCA-063, 123 N.M. 453 ......................................................................23, 26

*In re Soc. Media Adolescent Addiction/Personal Injury Prods. Lia. Litig.*,
2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) .................................................13, 17

*Sorrell v. IMS Health Inc.*,
564 U.S. 552, 570 (2011)........................................................................................21

*People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*,
761 N.Y.S. 2d 192 (App. Div. 2003) .....................................................................27

*State v. Lead Indus. Ass'n*,
951 A.2d 428 (R.I. 2008)...................................................................................24, 25

*State v. Tiktok, Inc.*,
2023 WL 4305656 (Ind. Super. May 04, 2023)......................................................9

*State v. TikTok, Inc*,
No. 02D03-2212-PL-401, Order Granting Motion to Dismiss (Ind. Allen
Superior Ct. Nov. 29, 2023) (copy attached) .........................................................6

*Stevenson v. Louis Dreyfus Corp.*,
1991-NMSC-051, 112 N.M. 97, 811 P.2d 1308 (1991) ........................................29

*Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*,
984 F.2d 915 (8th Cir. 1993) .................................................................................27

*Town of Clayton v. S. D. Mayfield*,
   1971-NMSC-061, 485 P.2d 352 ......................................................26

*Turner Broadcasting Sys., Inc. v. FCC*,
   512 U.S. 622 (1994).......................................................................20

*State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque*,
   1994-NMSC-126, 119 N.M. 150, 889 P.2d 185 ...........................22, 23, 25

*Walden v. Fiore*,
   571 U.S. 277 (2014).....................................................................7, 9

*Walt Disney Prods., Inc. v. Shannon*,
   276 S.E.2d 580 (Ga. 1981)............................................................21

*Watters v. TSR, Inc.*,
   715 F. Supp. 819 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990) ...............................19

*Wilson v. Midway Games, Inc.*,
   198 F. Supp. 2d 167 (D. Conn. 2002) ...........................................21

*Winter v. Facebook, Inc.*,
   2021 WL 5446733 (E.D. Mo. Nov. 22, 2021) ...............................11

*XMission LC v. Fluent LLC*,
   955 F.3d 833 (10th Cir. 2020) ......................................................7, 9

*XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*,
   214 F. Supp. 3d 179 (E.D.N.Y. 2016) ...........................................32

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ...............................32

*Zeran v. Am. Online*,
   129 F.3d 327 (4th Cir. 1997) ....................................................10, 14

*Zhang v. Baidu.com Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014)..............................................20

**Statutes**

18 U.S.C. § 2258A(f)..........................................................................14

47 U.S.C. § 230(c)(1)........................................................................9, 12

47 U.S.C. § 230(e)(3)...........................................................................10

47 U.S.C. § 230(f)(2)...........................................................................11

Communications Decency Act Section 230 ............................................................1, 9, 15

NMSA 1978, § 57-12-2(D)..................................................................................27, 29

NMSA 1978, § 57-12-2(D)(14) ...................................................................................35

NMSA 1978, §§ 57-12-2(D), (E) .................................................................................30

NMSA 1978, § 57-12-3 ................................................................................................29

NMSA 1978, § 57-12-16 ..............................................................................................28

New Mexico Public Nuisance Law...............................................................................25

New Mexico Unfair Practices Act ..................................................................................1

Section 230........................................................................................................... *passim*

UPA ...................................................................................................................... *passim*

**Other Authorities**

First Amendment .................................................................................................. *passim*

Federal Rule of Civil Procedure 12(b)(2) and (b)(6) .....................................................1

Restatement (Second) of Torts § 538(2)(a)(b)............................................................35

Restatement (Second) of Torts § 821B (1979) ...........................................................22

Restatement (Second) of Torts § 821B(1) (1979)........................................................23

Restatement (Second) of Torts § 821B cmt. ...............................................................23

Restatement (Second) of Torts § 821B cmt. g ............................................................23

Rule 12(b)(2)...................................................................................................................4

Rule 12(b)(6)...................................................................................................................4

W. Page Keeton et al., Prosser and Keeton on Torts § 86 (5th ed. 1984)...................26

**Suspects**

Due Process Clause.........................................................................................................5

2019 WL 1102210 (S.D. Ala. Mar. 8, 2019) .................................................................8

# INTRODUCTION

The State's Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(2) and (b)(6) for lack of personal jurisdiction and failure to state a claim.[1]  The State asserts three claims under the New Mexico Unfair Practices Act ("UPA") and a public nuisance claim, asking this Court to impose civil penalties on Meta Platforms, Inc. ("Meta Platforms"), Instagram, LLC ("Instagram"), Meta Payments, Inc., and Meta Platforms Technologies, LLC (collectively, "Meta").[2]  Through these claims, the State seeks to hold Meta liable for the alleged publication of sexually exploitative content posted or transmitted by third parties on its services—content the State admits Meta prohibits—and otherwise to enjoin Meta from displaying third-party content that the State claims harms the mental health of young New Mexicans.

Meta condemns all forms of sex trafficking and child exploitation.  But there is no legal basis for the State's claims seeking to hold Meta liable for displaying content created and shared by third parties.  In an attempt at artful pleading to avoid settled federal constitutional and statutory prohibitions on claims against publishers of third-party content, the State points to certain website features that, it alleges, affect the way third-party content is presented, organized and displayed to users on Meta's services.  But the challenged features reflect core editorial functions of Internet providers that are immune from liability under Section 230 of the federal Communications Decency Act ("Section 230") and protected by the First Amendment—as courts nationwide have held.  The Court need not even reach those issues, however, given the State's failure to allege facts sufficient

---

[1]  Pursuant to D.N.M.LR-Civ. 7.1(a), the parties have conferred to negotiate mutual page extensions, with the understanding that this motion is opposed.

[2]  The Complaint also names Mark Zuckerberg in his personal capacity.  Mr. Zuckerberg was served on December 19, 2023 and will separately move to dismiss the claims against him.

to support personal jurisdiction over Meta in New Mexico.  And apart from these threshold barriers to suit, the State's factual allegations fail to support its UPA and public nuisance claims.

The State's claims should be dismissed for multiple reasons:

*First*, because the State's allegations do not establish that Meta is subject to either general or specific jurisdiction in New Mexico, the Complaint should be dismissed in its entirety for this reason alone.

*Second*, Section 230 bars the State's claims, which seek to hold Meta liable as a speaker or publisher of third-party content posted on Facebook, Instagram and WhatsApp.

*Third*, the First Amendment also bars the State's claims, which seek to hold Meta liable for its content policies and the alleged consequences of third-party content posted on Facebook, Instagram and WhatsApp.

*Fourth*, the State's public nuisance claim should be dismissed because the State's legal theory would expand the law of public nuisance beyond recognition to hold Meta liable for alleged actions unrelated to land or natural resources, and because the State's claims of harms to individual users of Meta's services cannot establish an interference with a right "common to the public."

*Fifth*, the State's UPA claims fail for several reasons.  The UPA expressly exempts entities, like Meta, that engage in dissemination of information.  And under the State's own allegations, the UPA does not apply to Meta's conduct because the statute only reaches conduct "in connection with the sale, lease, rental, or loan of goods or services."  Facebook, Instagram and WhatsApp do not meet this definition because—as the Complaint alleges—they are provided to users free of charge. Beyond these dispositive points, the State fails to state a UPA claim because many of the alleged misrepresentations are statements of opinion or generalized objectives, not actionable statements of fact, and the State has not alleged that any purported misrepresentations are material.

For each of these reasons, and because these defects cannot be cured, the State's Complaint should be dismissed with prejudice.

## BACKGROUND

Meta operates Facebook, Instagram and WhatsApp.  *See* Compl. ¶¶ 8-9.  Billions of people, including teenagers, use those services to connect and communicate with others online.  *Id.* ¶ 11. Meta's services allow users to connect and communicate with each other by hosting, organizing and disseminating a diverse array of user-generated content, including messages, photos and videos.  *Id.* ¶¶ 42-60.  Every user's experience on Meta's services is unique, reflecting the user's own choices and activities.  *Id.* ¶¶ 28-29.

The State asserts four claims: (1) unfair or deceptive trade practices under the UPA; (2) unfair trade practices under the UPA; (3) unconscionable trade practices under the UPA; and (4) public nuisance.  *See id.* ¶¶ 450-521.  Through those claims, the State broadly asserts that Meta is liable based on two categories of allegations.  *See id.* ¶ 1 ("Meta knowingly exposes children to the twin dangers of sexual exploitation and mental health harm").

*First*, the State seeks to hold Meta liable for the alleged presence of harmful content posted by third parties on its services, including Child Sexual Abuse Material ("CSAM"), Commercial Sexual Exploitation of Children ("CSEC") content, and content related to minor sex trafficking, alleging that "Facebook and Instagram are a breeding ground for predators who target children for human trafficking, the distribution of sexual images, grooming, and solicitation."  *Id.* ¶ 2.  The State acknowledges that Meta's policies prohibit users from posting these types of harmful third-party content, Compl. ¶ 68 & n.21, but alleges that Meta did not take sufficient actions to restrict or eliminate it.  *See, e.g.*, ¶¶ 69-70, 72, 74, 88, 93, 95–166, 167, 179, 180, 187, 192, 194.

*Second*, the State seeks to hold Meta liable for alleged "algorithms and platform designs that are addictive to young users."  *Id.* ¶ 3.  In particular, the State identifies alleged "design features,"

including "engagement-based feeds, infinite scroll, push notifications, ephemeral content, and auto play video," and alleges that these content publication features were "designed to increase the amount of time young users spend on [Meta's] platforms while inhibiting the ability of those users to self-regulate." *Id.*; *see also id.* ¶ 290 (listing allegedly addictive "design features"); *id.* ¶¶ 291–304 (allegations regarding engagement-based feeds and algorithms); *id.* ¶¶ 305-309 (allegations regarding "infinite scroll"); *id.* ¶¶ 310–317 (allegations regarding push notifications); *id.* ¶¶ 318–324 (allegations regarding ephemeral content); *id.* ¶¶ 325–330 (allegations regarding video content); *id.* ¶¶ 331–340 (allegations regarding "additional design choices").

## LEGAL STANDARD

Under Rule 12(b)(2), the Court should dismiss a complaint for failure to establish that a defendant is subject to personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2).  The plaintiff bears the burden of alleging and ultimately proving facts establishing personal jurisdiction. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007).

Under Rule 12(b)(6), the Court should dismiss a complaint that fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).  When ruling on such a motion, the Court accepts "all well-pleaded factual allegations in the complaint," *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1305 (10th Cir. 2020), but need not accept "a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, the plaintiff must allege facts stating a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "If, as a matter of law, the complaint . . . is insufficient, a motion to dismiss is proper." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1100 (10th Cir. 2017) (cleaned up).

**ARGUMENT**

I.   **THE STATE FAILS TO PLEAD FACTS SUFFICIENT TO ESTABLISH PERSONAL JURISDICTION.**

As a threshold matter, dismissal is warranted because the State has not met its burden to allege facts sufficient to support general or specific personal jurisdiction over Meta in New Mexico. Nor could it.  The Court should dismiss the State's Complaint with prejudice on this basis alone.

A.   **Meta Is Not Subject to General Jurisdiction in New Mexico.**

Meta is not subject to general jurisdiction in New Mexico because it is not "at home" in the State.  Corporate defendants generally are considered "at home" in only two states (at most): the state where the company has its principal place of business and the state of its incorporation.  *See Hood v. Am. Auto Care, Ltd. Liab. Co.*, 21 F.4th 1216, 1221 (10th Cir. 2021) (citing *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024 (2021)).  As the State acknowledges, none of the Meta Defendants is incorporated in or has its principal place of business in New Mexico. Compl. ¶¶ 8, 11–13.  And the State has not alleged, and could not allege, that this is an "exceptional case" where "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that state."  *See Ford Motor Co.*, 141 S. Ct. at 1024; *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014).  There is no general jurisdiction over Meta here.

B.   **Meta Is Not Subject to Specific Jurisdiction in New Mexico.**

The State's allegations also do not support the exercise of specific jurisdiction over Meta. Because New Mexico's long-arm statute is coextensive with the limitations of the Due Process Clause, courts in New Mexico cannot exercise specific jurisdiction over an out-of-state defendant unless that defendant maintains "minimum contacts" with the forum state and its claims "'***arise out of or relate to***'" those contacts.  *Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Can.*, 703

F.3d 488, 492-93 (10th Cir. 2012) (quoting *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc*., 205 F.3d 1244, 1247 (10th Cir. 2000)) (emphasis added).  The State cannot make that showing here.

        **1.**        **The Complaint Fails to Allege That This Case Arises Out of or Relates to Meta's Contacts in New Mexico.**

This litigation is assertedly based on Meta's alleged "platform design," Compl. ¶ 3; purportedly "false or misleading oral or written statements, visual descriptions, or other representations," *id.* ¶ 459; and "extensive research" conducted internally, *id.* ¶¶ 282-83.   Yet nowhere in its 521-paragraph Complaint does the State allege that ***any*** of this conduct occurred in or was directed to ***New Mexico***, so it cannot support specific personal jurisdiction over Meta.  *See CGC Holding v. Hutchens*, 974 F.3d 1201, 1209 (10th Cir. 2020) (specific jurisdiction exists only if the out-of-state defendant "purposely directed [its] activities at the forum and the plaintiff's injuries arose from the defendant's forum-related activities"); *Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021) (personal jurisdiction absent "when the communication was not specifically directed at the forum state"); Ex. 1, *State v. TikTok, Inc*, No. 02D03-2212-PL-401, Order Granting Motion to Dismiss, at 10 (Ind. Allen Superior Ct. Nov. 29, 2023) ("statements and alleged omissions" that were "directed to the U.S. market as a whole" cannot support personal jurisdiction in Indiana) (copy attached); *Johnson v. Gawker Media, LLC*, 2016 WL 193390, at *9 (E.D. Mo. Jan. 15, 2016) (no specific jurisdiction where there was no evidence that the corporate defendant "targeted its website, or the individual defendants their articles, toward the State of Missouri as opposed to the United States or the world as a whole").

The State's limited allegations regarding Meta's connections with New Mexico fail to establish personal jurisdiction and actually confirm that jurisdiction is lacking because the State's claims do not "arise out of or relate to" those contacts.  *Fireman's Fund Ins.*, 703 F.3d at 492–93 (quoting *Intercon*, 205 F.3d at 1247).  The State alleges that Meta provided advertisers tools to help

them target ads to users likely based in New Mexico, Compl. ¶¶ 24–34, 41, that Meta provided account monetization tools to users within New Mexico, *id.* ¶ 35, and that New Mexico residents buy or sell items to third parties using Facebook Marketplace, *id.*

But the State's ***claims*** are based on allegations that Meta "knowingly made numerous false or misleading oral or written statements, visual descriptions, or other representations," *id.* ¶ 459; *see also id.* ¶¶ 460–462, 498–500; and that it purportedly "design[ed]" its apps to "addict" users and without restricting allegedly harmful content, *id.* ¶ 477; *see also id.* ¶¶ 478–480, 482–83, 512–13, 515. Those claims are ***not*** based on Meta's sale of advertising services, its account monetization tools, or its provision of Facebook Marketplace. Because the allegations of Meta's New Mexico conduct are entirely unconnected to the State's claims, they cannot establish specific jurisdiction. *See Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 264 (2017) ("When there is no . . . connection" between the defendant's in-state activities and the claims, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."); *XMission LC v. Fluent LLC*, 955 F.3d 833, 849 (10th Cir. 2020) (specific jurisdiction requires that the alleged injuries "arise out of or relate to those activities" "underlying the controversy").

## 2. New Mexico Users' Interactions with or Alleged Harm from Meta's Services Cannot Establish Personal Jurisdiction.

The only allegations in the Complaint even purporting to link the State's claims to New Mexico are those asserting that New Mexico residents use and are harmed by Meta's services. Compl. ¶¶ 25, 35, 38–41, 227, 390, 452, 456, 467, 472, 484, 490, 494, 495, 500, 507, 509, 515. But it is black-letter law that the conduct of New Mexico ***users*** cannot create specific personal jurisdiction over ***Meta***. The jurisdictional analysis focuses on the ***defendant's*** conduct; actions by third-party users who download and use Meta's apps are irrelevant. *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 285, 290 (2014) (proper question for minimum contacts "is not where the plaintiff

7

experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way"); *Fireman's Fund Ins.*, 703 F.3d at 493 (question is whether "the defendant purposefully availed itself of the privilege of conducting activities within the forum State" (cleaned up)).

This focus on the defendant's conduct is required by due process, and there is no exception for internet-based allegations.  Maintaining a website or web-based service "does not . . . subject the operator to personal jurisdiction, even for actions relating to the site, simply because it can be accessed by residents of the forum state."  *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011); *see also Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021) ("clicks, visits, and views from forum residents cannot alone show purposeful availment").  Instead, courts consider whether the "defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff" there.  *Schrader*, 633 F.3d at 1241.

Consistent with these principles, numerous courts have held—as to Meta specifically—that activities by Meta's users in a given state do not, as a matter of law, establish personal jurisdiction over Meta in that state.  *See Harrison v. Facebook, Inc.*, 2019 WL 1090779, at *4 (S.D. Ala. Jan. 17, 2019) (general accessibility of Facebook's web site or mobile application insufficient for specific jurisdiction), *report and recommendation adopted*, 2019 WL 1102210 (S.D. Ala. Mar. 8, 2019); *Georgalis v. Facebook, Inc*., 324 F. Supp. 3d 955, 960 (N.D. Ohio 2018) ("Facebook's ubiquitous presence and numerous Ohio users, alone, do not constitute sufficient contacts"); *Ralls v. Facebook*, 221 F. Supp. 3d 1237, 1242-44 (W.D. Wash. 2016) (personal jurisdiction over Facebook did not exist "simply because a user avail[ed] himself of Facebook's services" in Washington); *Gullen v. Facebook.com, Inc*., 2016 WL 245910, at *2 (N.D. Ill. Jan. 21, 2016) ("the fact that its site is

accessible to Illinois residents does not confer specific jurisdiction over Facebook"); *Facebook, Inc. v. K.G.S.*, 294 So. 3d 122, 140 (Ala. 2019) (same).[3]

Were the rule otherwise, internet service providers would be subject to personal jurisdiction in all 50 states, based solely on the conduct of third-party users. The case law squarely rejects that result. *See Walden*, 571 U.S. at 285, 290; *XMission*, 955 F.3d at 844 (personal jurisdiction does not turn on a plaintiff-user's forum-related activities; otherwise "the defense of personal jurisdiction . . . would no longer exist" (citing *Shrader*, 633 F.3d at 1240)); *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019) (the contacts with "the forum state must be contacts that [the social media service] . . . creates, not the unilateral activity of persons other than the defendant").

The Court should dismiss the State's claims against Meta on this basis alone.

## II.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS THE STATE'S CLAIMS.

The State's claims are also barred by Section 230 since they seek to impose liability on Meta for harms allegedly resulting from third-party content on its services.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Enacted to "forbid the imposition of publisher liability" that could chill an internet service's "exercise of its editorial" activity, the law establishes broad "federal immunity to ***any state law cause of action*** that would hold computer service providers liable for information originating with a third party." *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206

---

[3] These decisions comport with cases across the country holding that users' conduct cannot establish personal jurisdiction over social media services. *See, e.g.*, *State v. Tiktok, Inc.*, 2023 WL 4305656, at *10 (Ind. Super. May 04, 2023) (rejecting argument that TikTok was subject to personal jurisdiction based on "substantial" Indiana user base); *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019) (no specific jurisdiction over Twitter where "the only facts alleged in the complaint that provide a link to Arkansas describe actions taken by plaintiffs").

F.3d 980, 984-85, 986 (10th Cir. 2000) (emphasis added).  As the Fourth Circuit explained in the seminal Section 230 case, "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium" and "made a policy choice" to "immunize service providers" that "serve as intermediaries" for others' speech so as "to avoid any such restrictive" "chilling effect."  *Zeran v. Am. Online*, 129 F.3d 327, 329, 330-31 (4th Cir. 1997).  To this end, Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles."  *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc).  Courts thus apply Section 230 immunity to dismiss claims at the pleading stage.  *See Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*, 591 F.3d 250, 254–55 (4th Cir. 2009).

By its terms, Section 230 immunity applies with full force to state law claims, including the claims the State asserts here for unfair and deceptive trade practices, and public nuisance.  The statute contains an express and broad preemption provision covering "any State . . . law that imposes liability inconsistent with the protections of Section 230.  *See* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").  And courts have read this provision per its broad language to cover state claims like those alleged here.  *See Hill v. StubHub, Inc.*, 727 S.E.2d 550 (N.C. Ct. App. 2012) (claims for unfair or deceptive trade practice); *Daniel v. Armslist, LLC*, 386 Wis. 2d 449, 483 (2019) (public nuisance claim based on dissemination of allegedly harmful third-party content); *see also Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1266, 1268-71 (D.C. Cir. 2019) ("unfair competition" and "false advertising" claims); *Shiamili v. Real Estate Grp. of N.Y., Inc.*, 952 N.E.2d 1011 (N.Y. 2011) (unfair competition claims); *see generally Bride v. Snap Inc.*, 2023 WL 2016927,

at *6 (C.D. Cal. Jan. 10, 2023) ("[T]he nature of Plaintiffs' legal claim does not alter the court's conclusion, whether based on negligence or false advertising.").

Nor is there any exception to Section 230 immunity when these unfair and deceptive trade practices and public nuisance claims are brought by state attorneys general. *See, e.g.*, *Free Speech Coal., Inc. v. Colmenero*, __ F. Supp. 3d __, 2023 WL 5655712, at *26 (W.D. Tex. Aug. 31, 2023) (applying "clear" text of Section 230 to bar state AG claims); *Google, Inc. v. Hood*, 96 F. Supp. 3d 584, 597 (S.D. Miss. 2015) (same), *vacated and remanded on other grounds*, 822 F.3d 212 (5th Cir. 2016) (but affirming same). "[W]hat matters is not the name of the cause of action" or the identity of the claimant, but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009).

Section 230 immunity applies where: (1) the defendant is a "provider . . . of an interactive computer service," and (2) the claim seeks to hold the defendant liable as a "publisher or speaker" of (3) content provided by someone else. *Silver v. Quora, Inc.*, 666 F. App'x 727, 729-30 (10th Cir. 2016). Meta is entitled to dismissal of the State's claims because each of these elements is met here.

### A.    Meta Is an Interactive Computer Service Provider.

Meta meets the first Section 230 element because it is a "provider . . . of an interactive computer service." 47 U.S.C. § 230(f)(2). Section 230 defines "interactive computer services" to include "any information service, system, or access software provider that provides or enables access by multiple users to a computer server." *Id.* Courts uniformly agree that Facebook and Instagram meet this definition because users access their services to share and obtain information. *See, e.g.*, *Sekiya v. Facebook*, 2017 WL 3588816, at *2 (D.N.M. Jan. 3, 2017) (Facebook); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (Facebook); *Dangaard v. Instagram, LLC*, 2022 WL 17342198, at *4 (N.D. Cal. Nov. 30, 2022) (Facebook and Instagram); *Winter v. Facebook, Inc.*,

2021 WL 5446733, at *4 (E.D. Mo. Nov. 22, 2021) (Facebook); *La'Tiejira v. Facebook*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017) (Facebook); *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156 n.10 (E.D.N.Y. 2017) (Facebook).

B.     **The State Seeks to Hold Meta Liable as a "Publisher or Speaker."**

Section 230 "mandates dismissal if . . . the complaint seeks to hold Facebook liable as [a] 'publisher or speaker' of third-party content." *Klayman*, 753 F.3d at 1357; *Johnson v. Arden*, 614 F.3d 785, 791–92 (8th Cir. 2010) (Section 230 applies to "any cause of action that would make service providers liable for information originating with a third-party user of the service") (cleaned up). Claims meet this test if they would "hold a service provider liable for" publishing functions, such as "deciding whether to publish, withdraw, postpone or alter content," *Johnson*, 614 F.3d at 792 (cleaned up), "arranging and distributing third-party information," *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019), or "reviewing," "editing," and "withdraw[ing]" content, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

Courts have repeatedly read Section 230(c)(1) to bar claims based on recommendation algorithms and so-called "design choices" through which social media companies organize or curate the third-party content users see, and how that content is displayed to them. *See Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019). Thus, in *Dyroff v. Ultimate Software Grp., Inc.*, the court held that Section 230 barred claims challenging "algorithms" used to "analyze user posts" and "recommend[]" content to users, because "tools meant to facilitate the communication and content of others" constitute "publish[ing]." 934 F.3d 1093, 1098 (9th Cir. 2019). And in the ongoing federal MDL addressing claims comparable to those the State asserts here, the court held that Section 230 barred claims against social media services, including Meta, based on the alleged "[u]se of algorithms to promote addictive engagement," the failure to impose "protective limits to the length and frequency of sessions," the failure to impose "blocks to use during certain times of day," the

failure to "provid[e] a beginning and end to a user's 'Feed'," the publication of "geolocating information for minors," "[r]ecommending minor accounts to adult strangers," "[l]imiting content to short-form and ephemeral content," and the "[t]iming and clustering of notification of third-party content in a way that promotes addiction." *In re Soc. Media Adolescent Addiction/Personal Injury Prods. Lia. Litig.*, 2023 WL 7524912, at *14-16 (N.D. Cal. Nov. 14, 2023) (hereafter "*In re Soc. Media Litig.*"). *See also Anderson v. TikTok, Inc.*, 637 F. Supp. 3d 276, 280 (E.D. Pa. 2022) (allegations attacking TikTok's algorithm were protected by Section 230 because they were premised on the "manner in which [TikTok] *published* a third party's dangerous content") (emphasis added)

Here, the State's claims impermissibly treat Meta as a publisher of third-party content. Specifically, the Complaint seeks to hold Meta liable for (1) allegedly failing "to restrict access to" harmful content created by users and shared with other users, including CSAM, CSEC and other sexually exploitative content, and (2) allegedly making an array of feature design choices that affect how user-generated content is organized, displayed and disseminated on Facebook, Instagram and WhatsApp. Compl. ¶ 477. The State's claims are barred by Section 230 because they seek to impose liability on Meta for its activities in publishing third-party content, as explained further below.

*CSAM and Other Exploitative Content.* The State seeks to hold Meta liable for third-party content shared by users on its services that allegedly relates to CSAM, human trafficking and other exploitative content. *See, e.g.*, Compl. ¶ 87 (alleging that "Meta's platforms contain account after account . . . depicting" CSAM and other illicit content); *see also id.* ¶¶ 1-2, 69, 95-166, 214, 224-26, 232-34, 405, 481.

As the State admits, Meta's policies prohibit this type of reprehensible content, Compl. ¶ 68 & n.21, and Meta takes actions to remove and report it where appropriate. But the State's claims

that Meta failed to review and remove some of this third-party content from its services would treat Meta as a ***publisher***—something that Section 230 does not allow.  Section 230 immunizes interactive computer service providers from claims that they "failed to remove" content because imposing such liability "necessarily involves treating" the service "as a publisher of the content it failed to remove." *Barnes*, 570 F.3d at 1103 ("removing content is something that publishers do"); *Silver v. Quora, Inc.*, 2016 WL 9777159, at *3-4 (D.N.M. June 13, 2016), *aff'd* 666 F. App'x 727 (10th Cir. 2016) (dismissing under Section 230 plaintiff's claim that turned "entirely on Quora's decision not to remove the allegedly defamatory statements").[4]

Section 230 squarely bars the State's claims that seek to treat Meta as the "publisher" of third-party content, including CSAM or other alleged illicit content.  "The national consensus is that all claims against internet companies stemming from their publication of information created by third parties effectively treat the defendants as publishers and are barred" by Section 230.  *In re Facebook*, 625 S.W.3d 80, 90 (Tex. 2021) (quotation omitted) (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).  Section 230 "'establishes a general rule' that web service providers may not be held 'legally responsible for information created by third parties if such providers merely enabled that content to be posted online.'"  *In re Facebook*, 625 S.W.3d at 90 (quoting *Nemet Chevrolet*, 591 F.3d at 254).  Thus, Meta cannot be held liable for acting as the "intermediar[y] for other parties' . . . injurious messages," *Zeran*, 129 F.3d at 330-31, even where the third-party content is "abusive," *Bride*, 2023 WL 2016927 at *6, and or includes other harmful messaging, *see Force*, 934 F.3d at 65 (providing Hamas a means to bring its "message to interested parties . . . falls within the heartland of what it means to be the 'publisher'") (citation omitted).

---

[4] In addition, holding Meta liable for failing to remove third-party CSAM or CSEC content it has not reviewed would be inconsistent with 18 U.S.C. § 2258A(f), which makes clear that service providers like Meta are not required to search, screen, or scan for such content.

Accordingly, courts have held that Section 230 bars claims that seek to hold interactive computer service providers liable for the harmful effects of third-party content posted on their services, even where the plaintiffs tried to style the claims in terms of the providers' own conduct— such as a failure "to ensure that sexual predators do not" interact with young users, *Doe II v. MySpace, Inc.*, 175 Cal. App. 4th 561, 573 (2009), allowing content that facilitates child sex crimes, *L.W. v. Snap Inc.*, 2023 WL 3830365, at *5 (S.D. Cal. June 5, 2023), or for failing to exclude third-party "child pornography," *Doe #1 v. Twitter, Inc.*, 2023 WL 3220912, at *2 (9th Cir. May 3, 2023). *See also Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1141 (9th Cir. 2022) ("[b]oth parties agree that section 230 immunity" applied to claims that Reddit "provides a platform that is easy to share child pornography, highlights subreddits that feature child pornography to sell advertising on those pages, allows users who share child pornography to serve as subreddit moderators, and fails to remove child pornography even when users report it," provided that an exemption from Section 230 not asserted here did not apply). Section 230 likewise bars the State's claims that Meta failed to monitor its site for, and remove, all alleged CSAM and other exploitative or harmful content. *Barnes*, 570 F.3d at 1103. Parties harmed by such content "may sue the third-party user who generated the content, but not the interactive computer service that enabled them to publish the content online." *Doe v. MySpace, Inc.*, 528 F.3d. at 419.

**App Features.** The State identifies several "features" that it alleges contribute to harms suffered by young users of Facebook, Instagram and WhatsApp—namely, algorithms, Compl. ¶¶ 291-304; "infinite scroll," *id.* ¶¶ 305-09; push notifications, *id.* ¶¶ 310-17; "ephemeral content," *id.* ¶¶ 318-24; "autoplay" and "Reels," *id.* ¶¶ 325-30; and "image filters," *id.* ¶¶ 332-35. The allegations about these design features—all of which involve ways that Meta's services organize, arrange and present third-party content to users—make clear that the State seeks to impose liability

for Meta's conduct as a publisher of third party-content.  *See* Compl. ¶ 299 (Meta's "algorithms suffer from a fatal flaw—they do not distinguish between permissible and impermissible ***content***" (emphasis added)); *id.* ¶ 305 (Facebook and Instagram feeds show "a portion of the next piece of ***content***, which the user is thereby enticed to view" (emphasis added)); *id.* ¶ 311 ("Push notifications may be sent for a variety of activity, including when ***another user*** follows them, or likes or comments on their post." (emphasis added)); *id.* ¶ 318 (ephemeral "***content*** elicits a prompt response and increases user engagement" (emphasis added) (internal citations and quotation marks omitted)); *id.* ¶ 325 ("Like other ***content***, Reels display 'likes,' follows, comments and views of a particular video." (emphasis added)); *id.* ¶ 332 (image filters allow "users to ***modify their pictures***," *i.e.*, content, "by altering their appearances in photos and videos"); *id.* ¶ 390 (Meta's "***decisions to implement (or not to implement) features*** in order to maximize teen engagement and profits caused real and lasting harm to young users" (emphasis added)).

As courts have repeatedly held, such challenges to the "structure and operation of [a] website," including "features that are part and parcel of [its] overall design and operation," all "reflect choices about what content can appear on the website and in what form" and thus "fall within the purview of traditional publisher functions." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016)); *accord Nemet*, 591 F.3d at 256–57 (Section 230 protects website's "structure and design"); *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 328 (E.D.N.Y. 2018) (Section 230 protects "features" that "are part and parcel of the overall design and operation of the website" (quotation omitted)), *aff'd in relevant part*, 934 F.3d 53 (2d Cir. 2019).

Claims based on Meta's alleged "design choices" about how content is organized, displayed and arranged for users thus seek to impose liability on Meta for its activities as the publisher of third-

party content.  *See, e.g.*, *Force*, 934 F.3d at 70 ("[A]rranging and displaying others' content to users of Facebook through such algorithms—even if the content is not actively sought by those users—is not enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content.").

As the MDL court held recently, alleged design features such as notifications to "alert users to third-party content," "[n]ot providing a beginning and end to a user's 'Feed,'" and "[l]imiting content to short-form and ephemeral content" "directly target defendants' roles as publishers of third-party content and are barred by Section 230." *In re Soc. Media Litig*., 2023 WL 7524912, at *16.  It "has been the unanimous view of other courts [that] claims alleging that defectively designed internet products allowed for transmission of harmful third-party communications" are barred by Section 230.  *In re Facebook*, 625 S.W.3d at 94.  *See also L.W*., 2023 WL 3830365, at *4 (dismissing claims focused on Snapchat's "ephemeral design features, specifically the disappearing messages"); *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (Section 230 barred claim that Snapchat "allows messages to automatically delete after a short period of time"); *Fed. Trade Comm'n v. Match Grp., Inc.*, 2022 WL 877107, at *7–8 (N.D. Tex. Mar. 24, 2022) (notifications); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021) (filters), *aff'd in relevant part sub. nom.*, *Doe #1*, 2023 WL 3220912; *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (comments and likes).

**Failure to Warn/Alleged Misrepresentations by Omission.**  The State's claims that Meta failed to disclose or provide warnings regarding the potential for encountering exploitative content or the alleged effects of Meta's app features, *see, e.g.*, Compl. ¶ 462, also would treat Meta as a publisher under Section 230.  Any other rule would render Section 230 a dead letter, as plaintiffs could simply repackage impermissible claims involving alleged harm from third-party content as an omission claim.  For that reason, courts have consistently dismissed failure-to-warn claims where,

17

as here, the claims are "inextricably linked" to a service's "alleged failure to edit, monitor, or remove" third-party content. *Herrick v. Grindr, LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) ("requiring [an interactive computer service] to post a warning at the outset or along with each profile is no different than requiring [the service] to edit the third-party content itself"); *In re Facebook, Inc.*, 625 S.W.3d at 93 ("Regardless of whether Plaintiffs' claims are couched as failure to warn, negligence, or some other tort of omission, any liability would be premised on second-guessing of [service's] 'decisions relating to the monitoring, screening, and deletion of [third-party] content . . . .'"). The same logic applies to consumer protection claims that are premised on the same theory of liability. *See Bride*, 2023 WL 2016927, at *7 (dismissing statutory false advertising claims "for the same reason as Plaintiffs' failure to warn claims: because they are all predicated on allegations concerning activity immunized by Section 230"). The second Section 230 element is satisfied.

### C.     The State's Claims Treat Meta as the Publisher of Third-Party Content.

The final element for Section 230 immunity is met because all of the State's claims treat Meta's services as the publishers of ***third-party*** content. *First*, the State acknowledges that third-party users of Meta's services—not Meta—created the alleged content at issue in the Complaint. *See* Compl. ¶¶ 43-59. There is no allegation that Meta created ***any*** of the content challenged in the Complaint. *See, e.g.*, *id*. ¶ 56 (explaining that "posts on a user's feed consist of posts from other users who have been followed by the user viewing his or her feed" and "suggested posts" from other users that person has not followed—*i.e.*, not content created by Meta), ¶ 308 (noting that the "infinite scroll feature" shows users posts from accounts they do and do not follow, rather than content generated by Meta). Without any allegation that Meta *created* any allegedly harmful content, the State's claims "boil[] down" to targeting Meta for *publishing* it. *Roommates*, 521 F.3d at 1170-71.

*Second*, courts have repeatedly held that a social media service's use of design features to organize, display and disseminate third-party content to users does not make it the creator or

developer of that content. *See, e.g.*, *Force*, 934 F.3d at 70 ("arranging and displaying others' content to users of Facebook through such algorithms—even if the content is not actively sought by those users—is not enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content"); *Kimzey*, 836 F.3d at 1270 ("proliferation and dissemination of content does not equal creation or development of content"); *Dyroff*, 934 F.3d at 1098 ("features and functions" such as "algorithms," "recommendations[,] and notifications," are "tools meant to facilitate the communication and content of others," and not "content in and of themselves").

In short, because the State's claims seek to impose liability on Meta as a publisher of third-party content, they are barred by Section 230.

## III. THE FIRST AMENDMENT BARS THE STATE'S CLAIMS SEEKING TO HOLD META LIABLE FOR ITS CONTENT POLICIES.

The First Amendment separately provides broad protection for the exercise of editorial discretion by a publisher in organizing and displaying information generated by third parties. To the extent the State's claims seek to hold Meta liable for its content policies and other editorial functions associated with the curating and posting of third-party content, they are barred by the First Amendment.[5]

The State alleges that Meta violated the UPA and is liable for public nuisance because of the allegedly harmful consequences of users' exposure to third-party content that Meta purportedly allows to be posted or shared by users via its services, despite its stated policies prohibiting such content. *See, e.g.*, Compl. ¶¶ 1-2, 43-53, 55-60, 69, 167, 232-34, 481. But "the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First

---

[5] Courts have recognized the "devastatingly broad chilling effect" of claims based on protected speech and routinely dismiss such claims at the pleadings stage. *Watters v. TSR, Inc.*, 715 F. Supp. 819, 822 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990).

Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, Inc., 515 U.S. 557, 570 (1995).  This includes "the exercise of editorial control and judgment" over content generated by others.  *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994).

That constitutional protection fully applies to claims challenging content policies employed by social media companies—including, as here, the alleged failure to implement or enforce policies that prohibit and or limit harmful content, as well as a service's use of algorithmic recommendations to display content to users.  Courts have recognized that decisions by social media services "about what content to include, exclude, moderate, filter, label, restrict, or promote" "are protected by the First Amendment." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022)), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).  *See, e.g.*, *Alario v. Knudsen*, 2023 WL 8270811, at *6 (D. Mont. Nov. 30, 2023) (TikTok's "decisions related to how it selects, curates, and arranges content are . . . protected by the First Amendment"); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 439–40 (S.D.N.Y. 2014) ("When search engines select and arrange others' materials . . . they are engaging in fully protected First Amendment expression."); *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3, n.3 (N.D. Cal. Jan. 12, 2022) (allegations that algorithms manipulated viewers "into watching content that was deeply harmful to them" were about speech because "[w]ithout the content, there would be no claim" (cleaned up)).  As the court noted in *O'Handley*, 579 F. Supp. 3d at 1187–88, social media services have "important First Amendment rights that would be jeopardized" if a court were to dictate "what content-moderation policies to adopt and how to enforce those policies."

Numerous courts have held that the First Amendment bars claims against publishers of third-party content that is alleged to have harmed those exposed to it.  *See, e.g.*, *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987) (barring claim by parents of minor who committed suicide after

reading magazine article); *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (1988) (barring claims against publisher of heavy metal music alleging that songs drove listener to suicide); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) (barring claim alleging that addictive and violent nature of video game caused stabbing by minor); *DeFilippo v. Nat'l Broad. Co.*, 446 A.2d 1036 (R.I. 1982) (barring claim alleging minor killed himself by emulating a simulated hanging from a television show); *Walt Disney Prods., Inc. v. Shannon*, 276 S.E.2d 580 (Ga. 1981) (barring claim that 11-year-old hurt himself by copying activity from Disney television program).

Under these settled principles, the First Amendment bars the State's claims that Meta failed adequately to enforce its content policies against harmful content, should have had more restrictive content policies, or employed algorithms that displayed allegedly harmful content to some users. *See, e.g.*, Compl. ¶¶ 43-53, 55-60, 69.  These allegations unambiguously challenge Meta's protected activities in developing and implementing its policies under which it displays or permits third-party content.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("creation and dissemination of information are speech within the meaning of the First Amendment"); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("if the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category") (cleaned up).  In short, the State's claims are barred by the First Amendment because they would impermissibly require the Court to dictate "what content-moderation policies" Meta must adopt and to tell it "how to enforce those policies." *O'Handley*, 579 F. Supp. 3d at 1187–88.  "[C]ontent-moderation activities qualify as First-Amendment-protected expressive conduct." *NetChoice, LLC v. Att'y Gen., Fla. (NetChoice)*, 34 F.4th 1196, 1214 (11th Cir. 2022), *cert. granted*, Nos. 22-277, 22-393.

Separately, the First Amendment bars the State's claims based on various "deceptive" and "unconscionable" practices alleged in Counts I and III of its Complaint, some of which turn on

supposed "misrepresentations" to Congress in response to direct questions.  See Compl. ¶¶ 304, 419-20.  That is because the First Amendment bars claims based on a defendant's efforts to petition the government, including Congressional testimony, even when the defendant's statements are allegedly false.  *See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000); *see also Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 297 (8th Cir. 1978) (First Amendment precludes liability for allegedly false statements to governmental body); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (same); *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1058 (9th Cir. 1998) (same).

## IV.    THE STATE CANNOT ESTABLISH THE ELEMENTS OF A PUBLIC NUISANCE CLAIM UNDER NEW MEXICO LAW.

New Mexico follows the Restatement (Second) of Torts' definition of public nuisance: an "unreasonable interference with a right common to the general public."  *City of Sunland Park v. Harris News, Inc.*, 2005-NMCA-128, ¶ 40, 138 N.M. 588 (quoting *State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque*, 1994-NMSC-126, ¶ 52, 889 P.2d 185); *see* Restatement (Second) of Torts § 821B (1979).

The State does not and cannot plead a claim under this standard, because it cannot allege facts that, if true, would establish an interference with a "right common to the public"—as opposed to alleged interferences with the well-being of individual users of Meta's services.  Further, under New Mexico law, the tort of public nuisance has been confined to interferences with land, water, air or other public resources, ***not*** to lawful services that allegedly cause harm to individual users.  The State's claim would unreasonably expand the scope of public nuisance law and should be rejected.

### A.    The State Cannot Establish an Unreasonable Interference with a "Right Common to the Public."

New Mexico, like virtually every state, requires that a public nuisance claim involve an interference with a "right common to the general public."  *Village of Los Ranchos*, 1994-NMSC-

126, ¶ 52 (a public nuisance is an "unreasonable interference with a right common to the general public" (quoting Restatement (Second) of Torts § 821B(1) (1979))). "This public right is one common to—belonging to—'all members of the general public.'" *Id.* (quoting Restatement (Second) of Torts § 821B cmt. g). A right "common to the public" is "collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." Restatement (Second) of Torts § 821B cmt. g.

It is not enough that conduct interferes with the rights of "a large number of persons." *State ex rel. Smith v. Riley*, 1997-NMCA-063, ¶ 8, 123 N.M. 453 (quoting Restatement (Second) of Torts § 821B cmt. g). Instead, to constitute a public nuisance, a defendant's conduct must interfere with a public right shared **equally** by **all** members of the public, such as access to air, water or rights-of-way. *See id.*; *accord Vill. of Los Ranchos de Albuquerque*, 1994-NMSC-126, ¶ 52; *see also State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 726 (Okla. 2021) ("a public right is a right to . . . **an indivisible resource** . . . like air, water, or public rights-of-way") (emphasis added); *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126 (Ill. App. Ct. 2005) (a public nuisance requires more than an interference with "an assortment of claimed private individual rights").

The State alleges that "[t]he unlawful and unreasonable conduct by the Defendants has created and/or facilitated [certain alleged] hazards to public health and safety," such as "Internet-facilitated human trafficking, distribution of CSAM and other illicit material over the internet, and social media addiction and its impact on the social and mental wellbeing of New Mexico teens and adolescents." Compl. ¶ 509. While the State's allegation of "public health and safety" hazards are unsupported, alleged adverse effects on the "social and mental wellbeing" of individual users of Meta's services does not in any event establish an interference with a right "common to the public."

This principle is reflected in the decision of the Rhode Island Supreme Court in *State v. Lead Indus. Ass'n*, 951 A.2d 428, 448 (R.I. 2008). There, the court recognized that "lead poisoning constitutes a public health crisis that has plagued and continues to plague this country, particularly its children." *Id.* at 436. But because the harms from lead poisoning arose from the exposure of individual children to lead paint, and thus involved a cumulation of adverse health effects on specific individuals, the court held that the marketing and distribution of lead-based paint did not interfere with a "public right" as compared to the aggregation of individual rights of each person to avoid physical harm. *See id.* at 448 ("a public right is more than an aggregation of private rights by a large number of injured people").

Other courts have similarly rejected public nuisance claims predicated on undisputed and significant public health and safety crises arising from individual exposure to lead paint, firearms, asbestos and cold medicine, among other examples.[6] For example, the Oklahoma Supreme Court recently dismissed public nuisance claims based on the manufacture and distribution of prescription opioids because the adverse health effects of opioid addiction and overdose involved harms to individual users of opioids, not an interference with rights "common to the public." *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d at 726.

The rights at issue here fall within the category of individual private rights, not rights "common to the public," because the State's allegations all involve purported harms to individual users of Meta's services allegedly caused by the features of those services and the third-party content

---

[6] *See, e.g.*, *In re Lead Paint Litig.*, 924 A.2d 484, 505 (N.J. 2007) (lead paint); *City of Chicago v. Beretta USA Corp.*, 821 N.E.2d 1099, 1148 (Ill. 2004) (handguns); *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 138 (Conn. 2001) (handguns); *Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000) (tobacco); *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 522 (Mich. Ct. App. 1992) (asbestos); *Ashley Cnty., v. Pfizer, Inc.*, 552 F.3d 659, 671–72 (8th Cir. 2009) (cold medicine).

they disseminate.  These include individuals allegedly harmed by Meta's "platform design," Compl. ¶¶ 3–4, 276, 281, 290–340, by purportedly "false or misleading oral or written statements, visual descriptions, or other representations," *id.* ¶ 459; *see also id.* ¶¶ 420, 444, 461, 464, and by alleged harms from exposure to illicit third-party content, *id.* ¶¶ 69-70, 72, 74, 88, 93, 95–166, 167, 179, 180, 187, 192, 194.  Such allegations, based on alleged harms to individuals who were purportedly misled or harmed by social media services, or allegedly exposed to harmful content on those services, involve individual rights to be free from harm, not rights "common to the public" that can establish a public nuisance claim.  As courts have recognized, the "allegation that defendants have interfered with the 'health, safety, peace, comfort or convenience of the residents of the [s]tate' standing alone does not constitute an allegation of interference with a public right."  *Lead Indus.*, 951 A.2d at 453.

Accordingly, the State's public nuisance claim must be dismissed because the State cannot establish the required interference with a right "common to the public."  *See Village of Los Ranchos*, 1994-NMSC-126, ¶ 52; *see Lead Indus.*, 951 A.2d at 453 (dismissing public nuisance claim alleging widespread adverse public health impacts on individuals, for failing to allege "that defendants have interfered with a public right as that term long has been understood in the law of public nuisance"); *see also City of Chicago*, 821 N.E.2d at 1116 ("We conclude that there is no authority for the unprecedented expansion of the concept of public rights to encompass the right asserted by plaintiffs" involving claims of widespread individual harms caused by gun violence.).

**B.    New Mexico Public Nuisance Law Does Not and Should Not Apply to Meta's Alleged Conduct.**

The State alleges that Meta's services—provided through software applications Meta developed and makes available to users—have been used by some bad actors for harmful purposes, and that this constitutes a public nuisance.  But no New Mexico case has ever held that the provision of a lawful service constitutes a public nuisance.  To permit the State's public nuisance claim to

proceed would run contrary to centuries of public nuisance jurisprudence in New Mexico and elsewhere, which has traditionally involved claims of interference with land, air, water and other public resources.  The Court should reject such a dramatic expansion of New Mexico law, which finds no foundation in the principles and boundaries of public nuisance law.

In particular, New Mexico's common law on public nuisance has been addressed to interferences with land and public resources such as air and water, not harms allegedly caused by the design and provision of lawful services.  *See, e.g.*, NMSA. 1978, § 30-8-1 (examples of "public rights" include "the right to use public property"); *State ex rel. Smith*, 1997-NMCA-063, ¶ 8 (public rights include "a right to fish" in a navigable stream); *Town of Clayton v. S. D. Mayfield*, 1971-NMSC-061, ¶ 3, 485 P.2d 352 (operation of an unfenced junkyard that constituted a fire and health hazard was a public nuisance); *State ex rel. New Mexico Water Quality Control Comm. v. City of Hobbs*, 1974-NMSC-064, ¶ 12, 525 P.2d 371 (operation of sewage treatment plant that contaminated underground water constituted a public nuisance).  The State's public nuisance claim stands far outside those conventional boundaries and does not remotely resemble the types of public nuisance claims traditionally permitted by New Mexico courts.

Many courts have recognized that, "[t]raditionally, the scope of nuisance claims has been limited to interference connected with real property or infringement of public rights."  *Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (citing W. Page Keeton et al., Prosser and Keeton on Torts § 86 at 617-18 (5th ed. 1984)).  Courts have rejected efforts to expand public nuisance law in ways that would "strai[n] the law to absurdity."  *Camden Cty. Bd. of Chosen Freeholders*, 273 F.3d at 540 (citing W. Page Keeton et al., Prosser and Keeton

on Torts § 86 at 617-18 (5th ed. 1984)).[7]   This Court should likewise reject the State's attempt to dramatically expand the scope of New Mexico public nuisance law by extending it to the provision of lawful social media services—something no authority in New Mexico supports, and no New Mexico court has ever done.

## V.   THE STATE'S UPA CLAIMS FAIL AS A MATTER OF LAW.

The State's UPA claims are barred in their entirety for the reasons discussed above.  *See supra* Parts I-III.  In addition, the State's Complaint fails to state a claim under the UPA because (1) Meta is exempt from the UPA under an explicit statutory exemption for entities, like Meta, that engage in the dissemination of information, and (2) the State does not and cannot allege that Meta's provision of free services to its users involves "a sale, lease, rental, or loan of goods or services."  NMSA 1978, § 57-12-2(D).  But even if these threshold bars did not exist, many of

---

[7] *See*, *e.g.*, *City of Huntington v. AmerisourceBergen*, 609 F. Supp. 3d 408, 474 (S.D.W. Va. 2022) ("a public right so broad and undefined would subject any potentially dangerous instrumentality to suit," making public nuisance "a monster that would devour in one gulp the entire law of tort"); *Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993) (same); *In re Lead Paint Litig.*, 924 A.2d at 505 (observing that plaintiffs' nuisance theory would "vest the public entities with a general tort-based remedy" or would "create an ill-defined claim that would essentially take the place of [existing] enforcement, abatement, and public health funding scheme[s]"); *District of Columbia v. Beretta, U.S.A. Corp.*, 872 A.2d 633, 650–51 (D.C. 2005) (en banc) (declining to adopt "a right of action for public nuisance applied to the manufacture and sale of guns"); *City of Chicago*, 821 N.E.2d at 1116 (expressing reluctance to countenance a cause of action "so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it"); *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S. 2d 192, 196 (App. Div. 2003) ("[G]iving a green light to a common-law public nuisance cause of action today will, in our judgment, likely open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities."); *City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882, 910 (E.D. Pa. 2000) ("The refusal of many courts to expand public nuisance law to the manufacturing, marketing, and distribution of products conforms with the elements of public nuisance law."), *aff'd*, 277 F.3d 415 (3d Cir. 2002); *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806 (Del. Super. Dec. 1, 2000) (dismissing public nuisance claim based on "negligent marketing, promotion and distribution of handguns").

Meta's alleged "misrepresentations" are not actionable statements of fact, and the State fails to allege that any of Meta's purported omissions are material, as the UPA requires.

### A.        The UPA Exempts Meta from Liability (Counts I, II, & III).

The UPA expressly exempts from liability "publishers, broadcasters, printers or other persons engaged in the dissemination of information or reproduction of printed or pictorial matters who publish, broadcast or reproduce material without knowledge of its deceptive or unconscionable character." NMSA 1978, § 57-12-16.  Meta falls squarely within this exemption.  Under the State's own allegations, Meta is "engaged in" the "dissemination of information."  As the Complaint alleges, Meta "offers an online social media networking platform that enables users to post and share images and videos with others, as well as interact with other users," Compl. ¶ 11, and provides services that allow for the "creation and proliferation of . . . content," Compl. ¶ 24.  *See also, e.g.*, *id.* ¶¶ 69-70, 72, 74, 88, 93, 95-166, 167, 179, 180, 187, 192, 194 (allegations regarding content published on Meta's platforms).

Further, the State does not and cannot allege that Meta disseminated information with "knowledge" of its "deceptive or unconscionable character."  Accordingly, by its plain terms, the UPA exemption applies to Meta's conduct in "the dissemination of information."  For this threshold reason, Meta is exempt from claims under the UPA.[8]

### B.        The UPA Does Not Apply to Meta's Provision of a Free Service Because There Is No "Sale, Lease, Rental, or Loan of Goods or Services" (Counts I, II & III).

---

[8] The Complaint includes the conclusory allegation that "Meta's conduct is not that of a publisher, simply presenting content created by others." Compl. ¶ 71.  But this does not alter the fundamental point that all the State's allegations of harmful content concern content generated by third parties, not Meta.  *See, e.g.*, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[I]n analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations.").

By its terms, the UPA applies only to "unfair or deceptive trade practices and unconscionable trade practices." NMSA 1978, § 57-12-3. An "unfair or deceptive trade practice" is defined to mean an act or practice "made in connection with the ***sale, lease, rental or loan of goods or services*** or in the extension of credit or in the collection of debts," N.M. Stat. Ann. § 57-12-2(D) (emphasis added). Likewise, the UPA defines the term "unconscionable trade practice" to mean an act or practice "in connection with the ***sale, lease, rental or loan***, or in connection with the offering for sale, lease, rental or loan, ***of any goods or services***." *Id.* § 57-12-2(E) (emphases added).

The UPA, as relevant here, thus applies only to a "sale, lease, rental or loan" of "any goods or services." Yet here, as the State alleges, Compl. ¶ 26, Meta provides its services to users free of charge. For this fundamental reason, the UPA does not apply to Meta's alleged conduct. *See, e.g., Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 166 P.3d 1091 (UPA claim requires proof of a "false or misleading representation . . . knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business"); *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 13, 811 P.2d 1308 (same); *Daye v. Cmty. Fin. Loan Serv. Centers, LLC*, 280 F. Supp. 3d 1222, 1246 (D.N.M. 2017) (same).[9]

The UPA "gives standing only to ***buyers*** of goods and services." *Hicks v. Eller*, 2012-NMCA-061, ¶ 20, 280 P.3d 304 (emphasis added); *see also id.* ("We understand [the UPA] to mean that . . . somewhere along the purchasing chain, the claimant did ***purchase an item that was at some point sold by the defendant***.") (emphasis added). In other words, although a UPA plaintiff need not in all circumstances purchase directly from the defendant, the conduct at issue must still occur "in

---

[9] Meta's alleged activities in providing services to advertisers (see Compl. ¶¶ 30-34) does not trigger the UPA because the State's claims are not based on those activities. Likewise, the State's allegations regarding "Facebook Marketplace," Compl. ¶ 35, the "Facebook Stars" program, and "Professional" accounts, *id.* ¶ 36-37, do not support its UPA claims because the State does not allege that such conduct has any relation to its claims.

connection with" a "sale, lease, rental or loan" of goods or services to a consumer.  *See id.*; NMSA 1978, §§ 57-12-2(D), (E); *Lohman*, 2007-NMCA-100, ¶ 5.  Here, the conduct upon which the State bases its UPA claims—Meta's admittedly free-of-charge provision of services that allegedly harmed users, *see, e.g.*, Compl. ¶¶ 1-3, 341-371, 390-401—cannot establish a claim under the UPA.

### C.    The State Fails to Allege Actionable Misrepresentations (Counts I & II).

New Mexico courts have recognized that an "essential element[]" of a UPA claim for unfair or deceptive trade practices is that "the defendant made an oral or written statement, a visual description or a representation of any kind that was either ***false or misleading***."  *Hicks*, 2012-NMCA-061, ¶ 18, 280 P.3d at 308 (emphasis added); *see also Andrews v. Stallings*, 1995-NMCA-015, ¶ 21, 892 P.2d 611 (a statement of fact is something plaintiff could theoretically "prove to be false").  Statements of opinion or generalized objectives, which courts often refer to as non-objective "puffery," are not actionable under the UPA.  *See, e.g.*, *Dollens v. Wells Fargo Bank, N.A.*, 2015-NMCA-096, ¶ 16, 356 P.3d 531 (noting that "non-actionable puffery" cannot form the basis of a claim under the UPA).

Many of the statements the State identifies as purported "misrepresentations" are not statements of fact at all.  As a preliminary matter, the Complaint repeatedly alludes to purported representations made by Meta without describing the alleged representations in any detail.  *See* Compl. ¶ 180 (asserting without citation or attribution "Facebook's claims to be safeguarding its platforms"); *id.* ¶ 196 ("This is particularly problematic in a context in which Meta has repeatedly assured its users and the public that all is well with regard to CSEC on its platforms."); *id.* ¶ 236 ("While Meta promised to safeguard the health and safety of children on its platforms . . . it made decisions that put its own profits ahead of their well-being."); *see also id.* ¶¶ 198, 202, 226.  These conclusory allegations cannot state a claim because they do not identify the alleged misrepresentation with even minimal detail.  *See, e.g.*, *Twombly*, 550 U.S. at 570.

Further, many of the specific "misrepresentations" the Complaint purports to identify cannot support its UPA claims:

**Statements Regarding Safety.**  The State bases the core of its claim that Meta engaged in "deceptive trade practices" (Count I) on allegations that Meta claimed its services were "safe" for young users.  *See, e.g.*, Compl. ¶ 1 ("Meta and its CEO tell the public that Meta's social media platforms are safe and good for kids.  The reality is far different."); *id.* ¶ 68 ("Its executives uniformly proclaim Meta's commitment to safety in interviews and posts on Meta's website."); *id.* ¶ 72 ("None of the content below . . . is consistent with Defendants' Meta's and Zuckerberg's representations that Meta maintains an environment that is safe for children[.]").  But the statements the State identifies are statements of opinion or generalized, non-quantifiable objectives or aspirations, not actionable statements of fact.  For example, the State cites (1) Facebook posts by Mark Zukerberg expressing his opinion that "it's very important to me that everything we build is safe and good for kids," *id.* ¶ 204, and that "[w]e care deeply about issues like safety, well-being and mental health," *id.* ¶ 403(h); (2) a statement by an unnamed Facebook spokesperson that Meta "take[s] human trafficking very seriously and a number of measures are in place to counter this activity," *id.* ¶ 403(a); (3) a statement by a Meta employee that "[m]aking the community a safer place, a place where people feel good, is a huge priority for Instagram . . . I would say one of the top priorities," *id.* ¶ 403(b); (4) a statement by a Meta executive that "[w]hile we continue to invest in helping businesses, we are equally focused on keeping our platform safe," *id.* ¶ 403(d); and (5) an opinion of a Meta executive that "Instagram's effects on the wellbeing of teenagers and adolescents was 'quite small,'" *id.* ¶ 403(f), among others, *see id.* ¶¶ 403(c), (i), 405, 406.

Such statements cannot form the basis for a misrepresentation claim under the UPA because they are not quantifiable and cannot be proven false.  For this reason, courts routinely dismiss

misrepresentation claims based on generalized or non-objective statements about "safety." *See, e.g.*, *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020) ("generalized assertions about Lyft's commitment to safety, its safety measures, and the role safety plays in the rideshare market" were "non-actionable puffery"); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (statements about "quality [and] safety" were nonactionable opinions); *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015) (statement that Uber is the "safest ride on the road" was "non-actionable puffery"); *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 183–84 (E.D.N.Y. 2016) (similar, for statement about "mak[ing] Uber the safest experience"); *Cooke v. Allstate Mgmt. Corp.*, 741 F. Supp. 1205, 1216 (D.S.C. 1990) (a "judgment and opinion about safety" "is certainly not the kind of statement [the] law would support as fraudulent").

The decision in *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017), demonstrates this point. There, the plaintiffs alleged that Yahoo's statement that "protecting our systems and our users' information is paramount" was misleading because Yahoo allegedly knew and did not disclose the risks of a breach of users' personal data, and then did not disclose actual data breaches after they occurred. *Id.* at *2–4, 26. The court dismissed the plaintiffs' consumer protection claims, holding that the statement was not a misrepresentation because it "is a vague and 'all-but-meaningless superlative[ ]' regarding how Defendants' prioritize the safety of their systems and their users' information." *Id.* at *26 (citation omitted). The same reasoning applies here. Meta's generalized, unmeasurable claims of prioritizing user "safety" or "well-being" are not statements of objective fact and therefore cannot be actionable as misrepresentations, as a matter of law.

**Prevalence of Harmful Content.**  The State similarly fails to allege that Meta's statements that users "did not encounter significant levels of harmful content'" were deceptive.  Compl. ¶ 461(a).  This claim rests on Meta's published Community Standard Enforcement Reports ("CSER"), which "provide metrics on how [Meta] enforced [its] policies . . . and estimates on the amount of violating content (Prevalence) on Facebook and Instagram." *Id.* ¶ 406.  The State claims the CSER's rates are false because a subjective user-survey conducted by Meta—the Bad Experiences & Encounters Framework ("BEEF")—purportedly showed higher rates of users self-reporting exposure to perceived harmful content. *Id.* ¶¶ 198, 266-69, 411.

There is a fundamental mismatch between Meta's alleged representations and the evidence that purportedly debunks them because the CSER, on the one hand, and BEEF, on the other hand, involve entirely different data.  The CSER measures the percentage of ***views*** of content that violates Meta's content standards, whereas BEEF reports the percentage of ***users*** who self-report having seen content they believe fall into certain inherently subjective and undefined categories of "harmful content."  Indeed, the State alleges that "there is a material gap between [the CSER's] narrow definition of prevalence and the actual distressing experiences that are enabled by Meta's" services. *Id.* 378.  That admission defeats the claim—the BEEF data do not address the same objective prevalence data as the CSER, and therefore do not contradict it.  Put simply, users may report in a survey that they viewed what they describe as harmful content, even though that content may not— and often does not—violate Meta's community standards.  The States' allegations regarding BEEF therefore do nothing to establish that the challenged statements regarding the CSER are false or misleading.[10]  *See Cullen v. Netflix, Inc.*, 2013 WL 140103, at *7 (N.D. Cal. Jan. 10, 2013), *aff'd*,

---

[10] Meta disputes the implication that its community standards are in any way inadequate, or that the BEEF data are better reflections of the prevalence of harmful content than the CSER. Moreover, to the extent the State suggests that Meta's content moderation policies are insufficient, (continued…)

600 F. App'x 508 (9th Cir. 2015) (misrepresentation-based consumer protection claims failed because "[a]t the heart of Plaintiff's claims . . . lies a discrepancy between the ways he and Defendant claim to calculate" the metric at issue, and thus the defendant's "statements . . . do not appear to be false").

**Other Non-Actionable Statements.**   Other alleged misrepresentations the State identifies also cannot support a UPA claim because—even accepting the State's allegations as true—the State fails to adequately allege that Meta's statements were false.   For example, the State repeatedly cites to statements that Meta does "not allow content or activity that sexually exploits or endangers children."   *E.g.*, Compl. ¶ 68; *see also id.* ¶ 403(g) ("Sex trafficking and child exploitation are abhorrent and we don't allow them on Facebook.").   But while the State alleges that Meta does not do enough to eliminate the presence of such material on its services, *see*, *e.g.*, Compl. ¶¶ 69-70, 72, 74, 88, 93, 95-166, 167, 179, 180, 187, 192, 194, it has not alleged that Meta's statements regarding its policies prohibiting such conduct were untruthful.   The presence of such content on Meta's apps— content posted by third parties—is not inconsistent with Meta's truthful statements that its policies prohibit "content or activity that sexually exploits or endangers children."   *Id.* ¶ 68.   Just as a store policy prohibiting shoplifting is not proven false by an episode of shoplifting, the allegation that a user of Meta's services violated Meta's policies does not disprove those policies' existence.

The State similarly cites to statements that Meta removes content that violates its policies. *See, e.g.*, Compl. ¶ 403(e).   But the State concedes that Meta ***does*** remove such content when it becomes aware of it.   *See id.* at ¶¶ 170, 179, 183, 187, 192.   Again, the State's allegations that Meta

---

any such claim would clearly be barred by Section 230 and the First Amendment.   *See supra* Sections II-III.

did not do enough to enforce its policies do not establish that Meta was untruthful in stating that it had those policies in place.

### D. The State Has Not Alleged that Any Purported Omissions Were Material (Counts I & II).

The State also alleges that Meta engaged in misrepresentations by omission.  *See* Compl. ¶¶ 298, 359, 371, 412-415.  But merely alleging that Meta omitted a fact is not sufficient to state a claim; the UPA applies only when a defendant has failed to state a ***material fact***.  NMSA 1978, § 57-12-2(D)(14); *see also Dollens v. Wells Fargo Bank, N.A.*, 2015-NMCA-096, ¶ 14, 356 P.3d 531 ("the UPA imposes an affirmative duty to disclose material facts reasonably necessary to prevent any statements from being misleading") (quotation omitted)).

An omission is "material" if "a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action."  *Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 72, 68 P.3d 909 (quoting Restatement (Second) of Torts § 538(2)(a)(b)).  In other words, as relevant here, an omission is not material unless it would have been important to a user's decision to use Meta's services.

Here, although the State alleges that several omissions of fact by Meta rose to the level of misrepresentations, Compl. ¶¶ 298, 359, 371, 412-415, it fails to allege facts that would establish that any such omissions were material to Meta's users.  Accordingly, none of the purported omissions alleged by the State can establish a claim under the UPA.

### CONCLUSION

For the foregoing reasons, Meta respectfully requests that the State's Complaint be dismissed with prejudice in its entirety.

December 27, 2023                    By: */s/ John C. Anderson*

John C. Anderson
Olga M. Serafimova
HOLLAND & HART LLP
110 N. Guadalupe Street, Suite 1
Santa Fe, NM 87501
Telephone: (505) 988-4421
jcanderson@hollandhart.com
omserafimova@hollandhart.com

Nathan E. Shafroth (*Pro Hac Vice* Forthcoming)
nshafroth@cov.com
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-6000
nshafroth@cov.com

Timothy C. Hester (*Pro Hac Vice* Forthcoming)
thester@cov.com
Covington & Burling LLP
One CityCenter 850 Tenth Street, NW ·
Washington, DC 20001-4956
Telephone: +1 (202) 662-6000
thester@cov.com

*Attorneys for Defendants Meta Platforms, Inc.,*
*Instagram, LLC, Meta Payments, Inc., and Meta*
*Platforms Technologies, LLC*

## CERTIFICATE OF SERVICE

I certify that on December 27, 2023, I filed the foregoing electronically with the Clerk of Court using CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James W. Grayson
Chief Deputy Attorney General
Raul Torrez, Attorney General of New Mexico
New Mexico Attorney General's Office
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Phone: (505) 218-0850

Email: jgrayson@nmag.gov

Serena R. Wheaton
Assistant Attorney General
New Mexico Attorney General's Office
Consumer & Environmental Protection Division
201 Third Street NW, Suite 300
Albuquerque, NM 87102
Phone: (505) 490-4846
Email: swheaton@nmag.gov

Linda Singer
David I. Ackerman
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Email: lsinger@motleyrice.com
Email: dackerman@motleyrice.com

*/s/ John C. Anderson*
John C. Anderson