**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| STATE OF NEW MEXICO, EX REL., RAÚL TORREZ, ATTORNEY GENERAL,<br><br>     Plaintiff,<br><br>   - v. -<br><br>META PLATFORMS, INC.; INSTAGRAM, LLC; META PAYMENTS, INC.; META PLATFORMS TECHNOLOGIES, LLC; and MARK ZUCKERBERG,<br><br>     Defendants. | Civ. No. 1:23-1115 MIS-KK |

**META'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

LEGAL STANDARD...................................................................................................... 4

ARGUMENT .................................................................................................................. 5

I.   THE STATE FAILS TO PLEAD FACTS SUFFICIENT TO ESTABLISH
     PERSONAL JURISDICTION.............................................................................. 5

     A.   Meta Is Not Subject to General Jurisdiction in New Mexico. ................ 5

     B.   Meta Is Not Subject to Specific Jurisdiction in New Mexico................. 5

          1.   The State Fails to Allege That Meta "Purposely Directed" Its
               Activities at New Mexico. ............................................................ 6

          2.   The State Fails to Allege That Its Claims "Arise Out Of or Relate
               To" Meta's Purported Contacts with New Mexico.................................. 7

          3.   New Mexico Users' Interactions with or Alleged Harm from
               Meta's Services Cannot Establish Personal Jurisdiction. ........................ 10

II.  SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS THE
     STATE'S CLAIMS. ............................................................................................ 12

     A.   Meta Is an Interactive Computer Service Provider................................. 13

     B.   The State Seeks to Hold Meta Liable as a "Publisher or Speaker." ...................... 14

     C.   The State's Claims Treat Meta as the Publisher of Third-Party Content. ........... 21

III. THE FIRST AMENDMENT BARS THE STATE'S CLAIMS SEEKING TO
     HOLD META LIABLE FOR ITS CONTENT POLICIES.............................................. 22

IV.  THE STATE CANNOT ESTABLISH THE ELEMENTS OF A PUBLIC
     NUISANCE CLAIM UNDER NEW MEXICO LAW.................................................... 25

     A.   The State Cannot Establish an Unreasonable Interference with a "Right
          Common to the Public."....................................................................... 26

     B.   New Mexico Public Nuisance Law Does Not and Should Not Apply to
          Meta's Alleged Conduct. ..................................................................... 28

     C.   The State Cannot Establish that Meta's Alleged Conduct Is a Proximate
          Cause of the Alleged Injuries................................................................ 30

i

V.      THE STATE'S UPA CLAIMS FAIL AS A MATTER OF LAW. ................................. 32

        A.      The UPA Exempts Meta from Liability (Counts I, II, & III). ............................ 33

        B.      The UPA Does Not Apply to Meta's Provision of a Free Service Because
                There Is No "Sale, Lease, Rental, or Loan of Goods or Services" (Counts
                I, II & III). ...................................................................................................................... 34

        C.      The State's Allegations Regarding Meta's Advertisers Fail to State a
                Claim. .............................................................................................................................. 35

                1.      The UPA Does Not Apply to the State's Allegations Regarding
                        Meta's Advertisers. .................................................................................... 35

                2.      The State Does Not Have *Parens Patriae* Authority to Bring
                        Claims on Behalf of Out-of-State Corporations. ...................................... 37

        D.      The State Fails to Allege Actionable Misrepresentations (Counts I & II)............ 40

        E.      The State Has Not Alleged that Any Purported Omissions Were Material
                (Counts I & II). .............................................................................................................. 44

CONCLUSION................................................................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alario v. Kndusen,*
2023 WL 8270811 (D. Mont. Nov. 30, 2023) ........................................................23

*Albuquerque Cab Co. v. Lyft,*
460 F. Supp. 3d 1215 (D.N.M. 2020) ...................................................................36

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
458 U.S. 592 (1982).......................................................................................38, 39

*Allegheny General Hosp. v. Philip Morris, Inc.,*
228 F.3d 429 (3d Cir. 2000).................................................................................27

*Anderson v. TikTok, Inc.,*
637 F. Supp. 3d 276 (E.D. Pa. 2022) ...................................................................15

*Andrews v. Stallings,*
1995-NMCA-015, 892 P.2d 611............................................................................39

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...............................................................................................4

*Ashley Cnty., v. Pfizer, Inc.,*
552 F.3d 659 (8th Cir. 2009) ....................................................................27, 30, 32

*Azar v. Prudential Ins. Co. of Am.,*
2003-NMCA-062, 68 P.3d 909...............................................................................45

*Estate of B.H. v. Netflix, Inc.,*
2022 WL 551701 (N.D. Cal. Jan. 12, 2022).........................................................23

*Bank of Am. Corp. v. City of Miami,*
137 S. Ct. 1296 (2017)......................................................................................30, 31

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) ......................................................13, 14, 16, 17

*Bartnicki v. Vopper,*
532 U.S. 514 (2001)...............................................................................................24

*Batalla Vidal v. Duke,*
295 F. Supp. 3d 127 (E.D.N.Y. 2017), *aff'd in part and remanded sub nom.*
*Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891
(2020)................................................................................................................38, 39

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................4, 40

*Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*,
   206 F.3d 980 (10th Cir. 2000) ............................................................12

*Blessing v. Chandrasekhar*,
   988 F.3d 889 (6th Cir. 2021) ..............................................................6

*BP Am., Inc. v. Oklahoma ex rel. Edmondson*,
   613 F.3d 1029 (10th Cir. 2010) ..........................................................38

*Bride v. Snap Inc.*,
   2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ..............................16, 20

*Briskin v. Shopify, Inc.*,
   87 F.4th 404 (9th Cir. 2023) ...............................................................7

*Bristol-Myers Squibb Co. v. Superior Court*,
   582 U.S. 255 (2017) ........................................................................8, 9

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
   861 F.3d 1081 (10th Cir. 2017) ..........................................................4

*Calkins v. Cox Estates*,
   1990-NMSC-044, 792 P.2d 36 ...........................................................30

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
   208 F.3d 885 (10th Cir. 2000) ............................................................24

*CGC Holding v. Hutchens*,
   974 F.3d 1201 (10th Cir. 2020) ...................................................5, 6, 7

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
   168 F.3d 119 (3d Cir. 1999)................................................................25

*City of Chicago v. Am. Cyanamid Co.*,
   823 N.E.2d 126 (Ill. App. Ct. 2005) ...................................................28

*City of Chicago v. Beretta USA Corp.*,
   821 N.E.2d 1099 (Ill. 2004)...........................................................27, 29

*City of Huntington v. AmerisourceBergen*,
   609 F. Supp. 3d 408 (S.D.W. Va. 2022)..............................................29

*City of Philadelphia v. Beretta U.S.A. Corp.*,
   126 F. Supp. 2d 882 (E.D. Pa. 2000), *aff'd*, 277 F.3d 415 (3d Cir. 2002)..............29

*City of Sunland Park v. Harris News, Inc.*,
2005-NMCA-128, 124 P.3d 566 ........................................................................25

*Cohen v. Facebook, Inc.*,
252 F. Supp. 3d 140 (E.D.N.Y. 2017) ...............................................................14

*Cooke v. Allstate Mgmt. Corp.*,
741 F. Supp. 1205 (D.S.C. 1990) ......................................................................42

*Cullen v. Netflix, Inc.*,
2013 WL 140103 (N.D. Cal. Jan. 10, 2013), *aff'd*, 600 F. App'x 508 (9th Cir.
2015) ..................................................................................................................43

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .............................................................................................5

*Dangaard v. Instagram, LLC*,
2022 WL 17342198 (N.D. Cal. Nov. 30, 2022) ...........................................14, 46

*Daniel v. Armslist, LLC*,
386 Wis. 2d 449 (2019) .....................................................................................13

*Daye v. Cmty. Fin. Loan Serv. Centers, LLC*,
280 F. Supp. 3d 1222 (D.N.M. 2017) ...............................................................34

*DeFilippo v. Nat'l Broad. Co.*,
446 A.2d 1036 (R.I. 1982).................................................................................23

*Detroit Bd. of Educ. v. Celotex Corp.*,
493 N.W.2d 513 (Mich. Ct. App. 1992) ...........................................................27

*District of Columbia v. Beretta, U.S.A. Corp.*,
872 A.2d 633 (D.C. 2005) (en banc) ................................................................29

*Doe #1 v. Twitter, Inc.*,
2023 WL 3220912 (9th Cir. May 3, 2023) .........................................................17

*Doe II v. MySpace, Inc.*,
175 Cal. App. 4th 561 (2009) ...........................................................................17

*Doe v. Grindr*,
__ F. Supp. 3d __, 2023 WL 9066310 (C.D. Cal. Dec. 28, 2023)............17, 20, 22

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ............................................................................17

*Doe v. Sch. Dist. No. 1, Denver, Colo.*,
970 F.3d 1300 (10th Cir. 2020) ..........................................................................4

*Doe v. Snap, Inc.*,
  2022 WL 2528615 (S.D. Tex. July 7, 2022)................................................19

*Doe v. Twitter, Inc.*,
  555 F. Supp. 3d 889 (N.D. Cal. 2021), *aff'd in relevant part sub. nom.*, *Doe
  #1*, 2023 WL 3220912 ................................................19

*Does 1-6 v. Reddit, Inc.*,
  51 F.4th 1137 (9th Cir. 2022) ................................................17, 44

*Dollens v. Wells Fargo Bank, N.A.*,
  2015-NMCA-096, 356 P.3d 531................................................40, 44

*Doshier v. Twitter, Inc.*,
  417 F. Supp. 3d 1171 (E.D. Ark. 2019)................................................6, 7, 11

*In re Facebook*,
  625 S.W.3d 80 (Tex. 2021)................................................16, 19, 20

*Facebook, Inc. v. K.G.S.*,
  294 So. 3d 122 (Ala. 2019)................................................11

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ................................................12, 21

*Fed. Trade Comm'n v. Match Grp., Inc.*,
  2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ................................................19

*Fields v. Twitter, Inc.*,
  217 F. Supp. 3d 1116 (N.D. Cal. 2016) ................................................18

*Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Can.*,
  703 F.3d 488 (10th Cir. 2012) ................................................7, 9, 10

*Firstenberg v. Monribot*,
  2015-NMCA-062, 350 P.3d 1205................................................30

*Force v. Facebook, Inc.*,
  304 F. Supp. 3d 315 (E.D.N.Y. 2018), *aff'd in relevant part*, 934 F.3d 53 (2d
  Cir. 2019) ................................................14, 17, 19, 21

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) ................................................41

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
  141 S. Ct. 1017 (2021)................................................5

*Free Speech Coal., Inc. v. Colmenero,*
__ F. Supp. 3d __, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023) ...................................... 13

*Gandydancer, LLC v. Rock House CGM, LLC,*
2019-NMSC-021, 453 P.3d 434 ........................................................................... 35, 36, 37

*Ganim v. Smith & Wesson Corp.,*
780 A.2d 98 (Conn. 2001) ..................................................................................................... 27

*Georgalis v. Facebook, Inc.,*
324 F. Supp. 3d 955 (N.D. Ohio 2018) ............................................................................... 11

*Google, Inc. v. Hood,*
96 F. Supp. 3d 584 (S.D. Miss. 2015), *vacated and remanded on other
grounds*, 822 F.3d 212 (5th Cir. 2016) ............................................................................... 13

*Greater Hous. Transp. Co. v. Uber Techs., Inc.,*
155 F. Supp. 3d 670 (S.D. Tex. 2015) ................................................................................. 41

*Gullen v. Facebook.com, Inc.,*
2016 WL 245910 (N.D. Ill. Jan. 21, 2016) ........................................................................ 11

*Hall v. Bellmon,*
935 F.2d 1106 (10th Cir. 1991) ........................................................................................... 33

*Harrison v. Facebook, Inc.,*
2019 WL 1090779 (S.D. Ala. Jan. 17, 2019) ..................................................................... 10

*Hawaii v. Standard Oil Co. of Cal.,*
405 U.S. 251 (1972) ............................................................................................................... 38

*Herceg v. Hustler Mag., Inc.,*
814 F.2d 1017 (5th Cir. 1987) ............................................................................................. 23

*Herrick v. Grindr, LLC,*
765 F. App'x 586 (2d Cir. 2019) ......................................................................................... 20

*Hicks v. Eller,*
2012-NMCA-061, 280 P.3d 304 .................................................................................... 35, 39

*Hill v. StubHub, Inc.,*
727 S.E.2d 550 (N.C. Ct. App. 2012) ................................................................................. 13

*Hood v. Am. Auto Care, Ltd. Liab. Co.,*
21 F.4th 1216 (10th Cir. 2021) .............................................................................................. 5

*State ex rel. Hunter v. Johnson & Johnson,*
499 P.3d 719 (Okla. 2021) .............................................................................................. 26, 27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
 515 U.S. 557, 570 (1995).........................................................................23

*Johnson v. Arden*,
 614 F.3d 785 (8th Cir. 2010) ................................................................14

*Johnson v. Gawker Media, LLC*,
 2016 WL 193390 (E.D. Mo. Jan. 15, 2016) ...........................................6

*Johnson v. TheHuffingtonPost.com, Inc.*,
 21 F.4th 314 (5th Cir. 2021) ..................................................................10

*Kimzey v. Yelp!, Inc.*,
 836 F.3d 1263 (9th Cir. 2016) ....................................................19, 20, 22

*Klayman v. Zuckerberg*,
 753 F.3d 1354 (D.C. Cir. 2014) .............................................................14

*Kottle v. Northwest Kidney Centers*,
 146 F.3d 1056 (9th Cir. 1998) ...............................................................25

*L.W. v. Snap Inc.*,
 2023 WL 3830365 (S.D. Cal. June 5, 2023)......................................17, 19

*La'Tiejira v. Facebook*,
 272 F. Supp. 3d 981 (S.D. Tex. 2017) ...................................................14

*In re Lead Paint Litig.*,
 924 A.2d 484 (N.J. 2007)..................................................................27, 29

*Lohman v. Daimler-Chrysler Corp.*,
 2007-NMCA-100, 166 P.3d 1091 .....................................................34, 35

*In re Lyft Inc. Sec. Litig.*,
 484 F. Supp. 3d 758 (N.D. Cal. 2020) ...................................................41

*Mark Aero, Inc. v. Trans World Airlines, Inc.*,
 580 F.2d 288 (8th Cir. 1978) .................................................................25

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
 925 F.3d 1263 (D.C. Cir. 2019)..............................................................13

*McCollum v. CBS, Inc.*,
 202 Cal. App. 3d 989 (1988) ..................................................................23

*Melea, Ltd. v. Jawer SA*,
 511 F.3d 1060 (10th Cir. 2007) ...............................................................4

*N.M. State Highway Dep't v. Van Dyke*,
    1977-NMSC-027, 563 P.2d 1150 ....................................................................30

*Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ...............................................................12, 19

*NetChoice, LLC v. Att'y Gen., Fla. (NetChoice)*,
    34 F.4th 1196 (11th Cir. 2022), *cert. granted*, Nos. 22-277, 22-393 ...................24

*New Mexico v. McAleenan*,
    450 F. Supp. 3d 1130 (D.N.M. 2020) ....................................................................38

*State ex rel. New Mexico Water Quality Control Comm. v. City of Hobbs*,
    1974-NMSC-064, 525 P.2d 371 ....................................................................29

*O'Handley v. Padilla*,
    579 F. Supp. 3d 1163 (N.D. Cal. 2022) ..............................................................23, 24

*Pfizer, Inc. v. Lord*,
    522 F.2d 612 (8th Cir. 1975) ....................................................................38

*Quynh Truong v. Allstate Ins. Co.*,
    2010-NMSC-009, 227 P.3d. 73 ....................................................................36

*Ralls v. Facebook*,
    221 F. Supp. 3d 1237 (W.D. Wash. 2016)...........................................................11

*Sekiya v. Facebook*,
    2017 WL 3588816 (D.N.M. Jan. 3, 2017) ...........................................................14

*Shiamili v. Real Estate Grp. of N.Y., Inc.*,
    952 N.E.2d 1011 (N.Y. 2011)....................................................................13

*Shrader v. Biddinger*,
    633 F.3d 1235 (10th Cir. 2011) ....................................................................10

*Sills v. Smith & Wesson Corp.*,
    2000 WL 33113806 (Del. Super. Dec. 1, 2000) ....................................................29

*Silver v. Quora, Inc.*,
    2016 WL 9777159 (D.N.M. June 13, 2016), *aff'd* 666 F. App'x 727 (10th Cir. 2016) ....................................................................16

*Silver v. Quora, Inc.*,
    666 F. App'x 727 (10th Cir. 2016) ....................................................................13

*State ex rel. Smith v. Riley*,
    1997-NMCA-063, 942 P.2d 721....................................................................26, 28

*In re Soc. Media Adolescent Addiction/Personal Injury Prods. Lia. Litig.*,
    2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) .........................................................15, 19, 22

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)....................................................................................................24

*People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*,
    761 N.Y.S. 2d 192 (App. Div. 2003) ...........................................................................29

*State v. B&B Inv. Grp.*,
    329 P.3d 658 (D.N.M. 2014) .......................................................................................36

*State v. Lead Indus. Ass'n*,
    951 A.2d 428 (R.I. 2008)...............................................................................26, 27, 28

*State v. Tiktok, Inc.*,
    2023 WL 4305656 (Ind. Super. May 04, 2023)...........................................................11

*Stevenson v. Louis Dreyfus Corp.*,
    1991-NMSC-051, 811 P.2d 1308 ...............................................................................34

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised*
    (Nov. 25, 2015)............................................................................................................37

*Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*,
    984 F.2d 915 (8th Cir. 1993) .......................................................................................29

*Town of Clayton v. S. D. Mayfield*,1971-NMSC-061, 485 P.2d 352...................................28

*Turner Broadcasting Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)....................................................................................................23

*Twitter, Inc., v. Taamneh*,
    143 S. Ct. 1206 (2023).................................................................................................32

*State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque*,
    1994-NMSC-126, 889 P.2d 185 .................................................................25, 26, 28

*Walden v. Fiore*,
    571 U.S. 277 (2014).............................................................................................10, 11

*Walt Disney Prods., Inc. v. Shannon*,
    276 S.E.2d 580 (Ga. 1981)...........................................................................................24

*Watkins v. Fed. Ins. Co.*,
    2023 WL 3122698 (D.N.M. Apr. 27, 2023) ..................................................................9

*Watters v. TSR, Inc.*,
   715 F. Supp. 819 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990) ..............................22

*Wilson v. Midway Games, Inc.*,
   198 F. Supp. 2d 167 (D. Conn. 2002) ......................................................................................23

*Winter v. Facebook, Inc.*,
   2021 WL 5446733 (E.D. Mo. Nov. 22, 2021) .........................................................................14

*XMission LC v. Fluent LLC*,
   955 F.3d 833 (10th Cir. 2020) ...........................................................................................9, 11

*XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*,
   214 F. Supp. 3d 179 (E.D.N.Y. 2016) .....................................................................................41

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ........................................................................42

*Zeran v. Am. Online*,
   129 F.3d 327 (4th Cir. 1997) ..........................................................................................12, 16

*Zvelo, Inc. v. Check Point Software Techs., Ltd.*,
   418 F. Supp. 3d 664 (D. Colo. 2019) ........................................................................................8

**Statutes**

18 U.S.C. § 2258A(f) .....................................................................................................................16

47 U.S.C. § 230 ...............................................................................................................12, 13, 14

NMSA 1978, § 8-5-2(J) .................................................................................................................37

NMSA 1978, § 57-12-2 ...............................................................................................32, 34, 35, 44

NMSA 1978,  § 57-12-3 ............................................................................................................34, 37

NMSA 1978, § 57-12-16 ................................................................................................................33

**Other Authorities**

Restatement (Second) of Torts § 821B ....................................................................................25, 26

Federal Rule of Civil Procedure 12(b)(2) .......................................................................................4

Federal Rule of Civil Procedure 12(b)(6) .......................................................................................4

## INTRODUCTION

The State's Complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(2) and (b)(6) for lack of personal jurisdiction and failure to state a claim.[1]  The State asserts three claims under the New Mexico Unfair Practices Act ("UPA") and a public nuisance claim, asking this Court to impose civil penalties on Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., and Meta Platforms Technologies, LLC (collectively, "Meta").[2]  Through these claims, the State seeks to hold Meta liable for the alleged publication of sexually exploitative content posted or transmitted by third parties on its services—content the State admits Meta prohibits—and to enjoin Meta from displaying third-party content that the State claims harms the mental health of young New Mexicans and out-of-state businesses whose advertisements allegedly appear in proximity to offensive content.

Meta condemns all forms of sex trafficking and child exploitation.  But there is no legal basis for the State's claims seeking to hold Meta liable for displaying content created and shared by third parties.  The State challenges certain features of Meta's services that, it alleges, affect the way third-party content is presented, organized and displayed to users.  Those features reflect core editorial functions that are immune from liability under Section 230 of the federal Communications Decency Act ("Section 230") and protected by the First Amendment—as courts nationwide have held.  The Court need not even reach those issues, however, given the State's failure to allege facts sufficient to support personal jurisdiction over Meta in New Mexico.  And apart from these threshold barriers to suit, the State's factual allegations fail to support its UPA and public nuisance claims.

The State's claims should be dismissed for multiple reasons:

---

[1] Meta files this 45-page motion conditionally, based on its pending Motion for Leave to File Excess Pages.  *See* Dkt. No. 38.  Pursuant to D.N.M.LR-Civ. 7.1(a), Meta has asked the State for its position on the instant motion, which is opposed.

[2] The Complaint also names Mark Zuckerberg, Meta's CEO, in his personal capacity.  Mr. Zuckerberg will separately move to dismiss the claims against him.

*First*, because the State's allegations do not establish that Meta is subject to either general or specific jurisdiction in New Mexico, the Complaint should be dismissed in its entirety.

*Second*, Section 230 bars the State's claims, which seek to hold Meta liable for its activities in publishing third-party content posted on Facebook, Instagram and WhatsApp.

*Third*, the First Amendment also bars the State's claims, which seek to hold Meta liable for its content policies and the alleged consequences of third-party content posted on its services.

*Fourth*, the State's public nuisance claim should be dismissed because under New Mexico law that tort is limited to interferences with land or natural resources and has never been extended to the provision of lawful services, and because the State's claims of harms to individual users of Meta's services cannot establish an interference with a right "common to the public" or proximate causation, both of which are required elements of a public nuisance claim.

*Fifth*, the State's UPA claims fail for several reasons. The UPA expressly exempts entities, like Meta, that engage in dissemination of information. And under the State's own allegations, the UPA does not apply to Meta's conduct because the statute only reaches conduct "in connection with the sale, lease, rental, or loan of goods or services." Facebook, Instagram and WhatsApp do not meet this definition because—as the Complaint alleges—they are provided to users free of charge. Further, the State's claims regarding Meta's advertisers fail to state a claim under the UPA, which is designed to protect consumers and does not apply to alleged deceptions between businesses. Beyond these dispositive points, the State fails to state a UPA claim because many of the alleged misrepresentations are statements of opinion or generalized objectives, not actionable statements of fact, and the State has not alleged that any purported misrepresentations are material.

For each of these reasons, and because these defects cannot be cured, the State's Complaint should be dismissed with prejudice.

## BACKGROUND

Meta operates Facebook, Instagram and WhatsApp.  *See* First Amended Complaint ("FAC") ¶¶ 8-9.  Billions of people, including teenagers, use those services to connect and communicate with others online.  *Id.* ¶ 11.  Meta's services allow users to connect and communicate with each other by hosting, organizing and disseminating a diverse array of user-generated content, including messages, photos and videos.  *Id.* ¶¶ 47-67.  Every user's experience on Meta's services is unique, reflecting the user's own choices and activities.  *Id.* ¶¶ 33-34.

The State asserts four counts: (1) unfair or deceptive trade practices under the UPA; (2) unfair trade practices under the UPA; (3) unconscionable trade practices under the UPA; and (4) public nuisance.  *See id.* ¶¶ 489-560.  Through those counts, the State broadly asserts that Meta is liable based on two categories of alleged harms.  *See id.* ¶ 1 ("Meta knowingly exposes children to the twin dangers of sexual exploitation and mental health harm").

***First***, the State seeks to hold Meta liable for the alleged presence of harmful content posted by third parties on its services, including Child Sexual Abuse Material ("CSAM"), Commercial Sexual Exploitation of Children ("CSEC") content, and content related to minor sex trafficking, alleging that "Facebook and Instagram are a breeding ground for predators who target children for human trafficking, the distribution of sexual images, grooming, and solicitation."  *Id.* ¶ 2.  The State acknowledges that Meta's policies prohibit users from posting these types of harmful content, *id.* ¶ 75 & n.21, but alleges that Meta did not take sufficient actions to restrict or eliminate it.  *See, e.g.*, *id.* ¶¶ 76-77, 79, 81, 95, 100, 102-173, 174, 187-88, 195, 200, 202.  In addition to alleged harms to users, the State alleges that this third-party content harmed corporations that used Meta's services to display advertisements to users and that Meta purportedly made "misleading and deceptive claims" to those corporations "that its controls and procedures were sufficient to prevent their ads from being displayed in connection with problematic content."  FAC at 205, XVIII (capitalization changed).

**Second**, the State seeks to hold Meta liable for alleged "algorithms and platform designs that are addictive to young users." *Id.* ¶ 3. In particular, the State identifies alleged "design features," including "engagement-based feeds, infinite scroll, push notifications, ephemeral content, and auto play video," and alleges that these content publication features were "designed to increase the amount of time young users spend on [Meta's] platforms while inhibiting the ability of those users to self-regulate." *Id.*; *see also id.* ¶ 309 (listing allegedly addictive "design features"); *id.* ¶¶ 310–324 (allegations regarding engagement-based feeds and algorithms); *id.* ¶¶ 324-28 (allegations regarding "infinite scroll"); *id.* ¶¶ 329–336 (allegations regarding push notifications); *id.* ¶¶ 337–343 (allegations regarding ephemeral content); *id.* ¶¶ 344–349 (allegations regarding video content); *id.* ¶¶ 350–359 (allegations regarding "additional design choices").

## LEGAL STANDARD

Under Rule 12(b)(2), the Court should dismiss a complaint for failure to establish that a defendant is subject to personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden of alleging and ultimately proving facts establishing personal jurisdiction. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007).

Under Rule 12(b)(6), the Court should dismiss a complaint that fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When ruling on such a motion, the Court accepts "all well-pleaded factual allegations in the complaint," *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1305 (10th Cir. 2020), but need not accept "a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the plaintiff must allege facts stating a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "If, as a matter of law, the complaint . . . is insufficient, a motion to dismiss is proper." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1100 (10th Cir. 2017) (cleaned up).

## ARGUMENT

### I.  THE STATE FAILS TO PLEAD FACTS SUFFICIENT TO ESTABLISH PERSONAL JURISDICTION.

As a threshold matter, dismissal is warranted because the State has not met its burden to allege facts sufficient to support general or specific personal jurisdiction over Meta in New Mexico. Nor could it. The Court should dismiss the State's Complaint with prejudice on this basis alone.

### A.  Meta Is Not Subject to General Jurisdiction in New Mexico.

Meta is not subject to general jurisdiction in New Mexico because it is not "at home" in the State. Corporate defendants generally are considered "at home" in only two states (at most): the state where the company has its principal place of business and the state of its incorporation. *See Hood v. Am. Auto Care, Ltd. Liab. Co.*, 21 F.4th 1216, 1221 (10th Cir. 2021) (citing *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024 (2021)). As the State acknowledges, none of the Meta Defendants is incorporated in or has its principal place of business in New Mexico. FAC ¶¶ 8, 11–13. And the State has not alleged, and could not allege, that this is an "exceptional case" where "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that state." *Ford Motor Co.*, 141 S. Ct. at 1024; *see also Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014). There is no general jurisdiction over Meta here.

### B.  Meta Is Not Subject to Specific Jurisdiction in New Mexico.

The State's allegations also do not support the exercise of specific jurisdiction over Meta. Courts in New Mexico cannot exercise specific jurisdiction over an out-of-state defendant unless the defendant "purposely directed [its] activities at the forum ***and*** the plaintiff's injuries arose from the defendant's forum-related activities." *CGC Holding v. Hutchens*, 974 F.3d 1201, 1209 (10th Cir. 2020) (emphasis added). The State cannot make those showings here.

### 1. The State Fails to Allege That Meta "Purposely Directed" Its Activities at New Mexico.

This litigation is assertedly based on Meta's alleged "platform design[]," FAC ¶ 3; purportedly "false or misleading oral or written statements, visual descriptions, or other representations," *id.* ¶ 498; and "extensive research" conducted internally, *id.* ¶¶ 300-01. The State specifically contends that its claims are based on seven categories of Meta's alleged "actions, failures, and design decisions," ranging from alleged failure to verify users' ages and permitting bad actors to contact minors, to alleged failure to identify and report CSAM and "encourag[ing]" addiction through "harmful notifications." *Id.* ¶ 26 (listing seven categories of alleged conduct).

Yet nowhere in its 560-paragraph FAC does the State allege that ***any*** of this conduct occurred in or was directed to ***New Mexico***. For that fundamental reason, this out-of-state conduct cannot support specific personal jurisdiction over Meta: it was not "purposely directed . . . at the forum." *CGC Holding*, 974 F.3d at 1209; *see also Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021) (personal jurisdiction absent "when the communication was not specifically directed at the forum state"); Ex. 1, *State v. TikTok, Inc*, No. 02D03-2212-PL-401, Order Granting Motion to Dismiss*, at 10 (Ind. Allen Superior Ct. Nov. 29, 2023) ("statements and alleged omissions" that were "directed to the U.S. market as a whole" cannot support personal jurisdiction in Indiana) (copy attached); *Johnson v. Gawker Media, LLC*, 2016 WL 193390, at *9 (E.D. Mo. Jan. 15, 2016) (no specific jurisdiction where there was no showing that the defendant "targeted its website . . . toward the State of Missouri as opposed to the United States or the world as a whole").

The mere operation of social media services that are available to users nationally (and internationally) is not sufficient to establish such "purposefully directed" activities in the forum state. *See Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019) ("Twitter has operated a website and advertising platform that is accessible nationwide, with no specific targeting by Twitter

of Arkansas residents.   These contacts are not sufficient even for specific jurisdiction in this context.").   "What is needed . . . is some prioritization of the forum state, some differentiation of the forum state from other locations, or some focused dedication to the forum state" that is "something substantial beyond the baseline connection that the defendant's internet presence already creates with every jurisdiction through its universally accessible platform."  *Briskin v. Shopify, Inc.*, 87 F.4th 404, 420 (9th Cir. 2023).   The State makes no allegations of any such "focused dedication" or "differentiation of the forum state," or of ***any*** conduct by Meta specifically targeting New Mexico.

For the same reasons, the State's allegations of misrepresentations involving Meta's sale of advertising services to out-of-state corporations cannot show any activity "purposely directed" at New Mexico.   In fact, the State makes no allegation that Meta's purported advertising-related misrepresentations to Walmart (an Arkansas company) or Match (a Texas company) have any connection at all to New Mexico.   FAC ¶¶ 437-55.   At most, the State alleges facts that Meta's representations were ***not*** specific to New Mexico and were made widely available nationally and internationally on its Business Help Center, *id.* ¶¶ 438-39—allegations insufficient as a matter of law to establish conduct "purposely directed" at New Mexico, *CGC Holding*, 974 F.3d at 1209; *see also Doshier*, 417 F. Supp. 3d at 1178 (Twitter's nationwide service not sufficient to establish conduct purposely directed at Arkansas); *Briskin*, 87 F.4th at 420 (personal jurisdiction requires "something substantial beyond" universal accessibility).

> **2.**   **The State Fails to Allege That Its Claims "Arise Out Of or Relate To" Meta's Purported Contacts with New Mexico.**

Personal jurisdiction is lacking over an out-of-state defendant unless the plaintiff alleges (and ultimately proves) that its claims "'***arise out of or relate to***'" the defendant's contacts with the forum state.  *Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Can.*, 703 F.3d 488, 492-93 (10th Cir. 2012) (quoting *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000))

(emphasis added).  The State fails to allege that its claims "arise out of" or "relate to" Meta's purported contacts with New Mexico, and on this basis alone personal jurisdiction is lacking.

The State's limited allegations regarding Meta's contacts with New Mexico in fact confirm that its claims do not "arise out of or relate to" those contacts.  The State alleges that Meta operates a data center in Los Lunas, New Mexico, and that this data center houses servers and network infrastructure that "permit Meta's platforms to operate."  FAC ¶ 21.  But these allegations cannot establish personal jurisdiction because the State has not alleged any connection between the data center and its claims.  *See Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 264 (2017) ("unconnected activities" do not establish specific jurisdiction).

Meta's data centers (of which Los Lunas is the only one in New Mexico) are physical locations that house Meta's computing equipment and hardware, such as servers, data storage drives, and network equipment.  Declaration of Bradley W. Davis ("Davis Decl.") ¶¶ 3, 4 (attached as Exhibit A).  The State has not alleged that its claims relate to or arise out of any data centers, much less the Los Lunas data center in New Mexico specifically.  For example, the State has not alleged that the "design features" it challenges were developed or implemented at Los Lunas, or that any of Meta's alleged misrepresentations were made at that facility.  Because there is "no . . . connection" between the Los Lunas data center and the State's claims, *Bristol-Myers*, 582 U.S. at 264, its presence in New Mexico does not establish specific jurisdiction over Meta.  *See, e.g.*, *Zvelo, Inc. v. Check Point Software Techs., Ltd.*, 418 F. Supp. 3d 664, 671 (D. Colo. 2019) ("Plaintiff has made no averment that defendant's alleged misappropriation of trade secrets is somehow connected to the Colorado office"; granting motion to dismiss for lack of personal jurisdiction).

The State's remaining allegations concerning Meta's purported connections to New Mexico, *see* FAC § III–IV, are that New Mexico residents use Facebook or Instagram, FAC ¶¶ 22, 43-46,

that Meta advertises its platforms to New Mexico residents, *id.* ¶ 22, that Meta provided advertisers tools to help them target ads to users likely based in New Mexico, FAC ¶¶ 29–39, 41, that Meta provided account monetization tools to users within New Mexico, *id.* ¶ 35, and that New Mexico residents buy or sell items to third parties using Facebook Marketplace, *id.* ¶ 40.

But the State's ***claims*** of alleged harms to Meta's users are based on allegations that Meta "knowingly made numerous false or misleading oral or written statements, visual descriptions, or other representations," *id.* ¶ 498; *see also id.* ¶¶ 499–501, 503-505; and that it purportedly "design[ed]" its apps to "addict" users and without restricting allegedly harmful content, *id.* ¶ 520; *see also id.* ¶¶ 500–01, 516–19, 521–22, 551–52. Those claims do not "arise out of" or "relate to" Meta's account monetization tools, its engagement with advertisers, or its provision of Facebook Marketplace. *See Bristol-Myers Squibb Co.*, 582 U.S. at 264 ("unconnected activities" do not establish specific jurisdiction); *Fireman's Fund Ins. Co.*, 703 F.3d at 492-93. And the State makes no allegation that Meta's interactions with out-of-state advertisers were purposely directed at New Mexico.

In short, because the allegations of Meta's New Mexico conduct are entirely unconnected to the State's claims, they cannot establish specific jurisdiction. *See Bristol-Myers*, 582 U.S. at 264 ("When there is no . . . connection" between the defendant's in-state activities and the claims, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."); *XMission LC v. Fluent LLC*, 955 F.3d 833, 849 (10th Cir. 2020) (specific jurisdiction requires that the alleged injuries "arise out of or relate to those activities" "underlying the controversy"); *Watkins v. Fed. Ins. Co.*, 2023 WL 3122698, at *4–5 (D.N.M. Apr. 27, 2023) (personal jurisdiction lacking where defendant's activities in the forum "bear[] no relation to Plaintiff's claims").

### 3. New Mexico Users' Interactions with or Alleged Harm from Meta's Services Cannot Establish Personal Jurisdiction.

The only allegations in the FAC even purporting to link the State's claims to New Mexico are those asserting that New Mexico residents use and are allegedly harmed by Meta's services. *E.g.*, FAC ¶¶ 20, 22, 43-44, 491, 495, 510-11, 559. But it is black-letter law that the conduct of New Mexico **users** cannot create specific personal jurisdiction over **Meta**. The jurisdictional analysis focuses on the **defendant's** conduct; actions by third-party users who download and use Meta's apps are irrelevant. *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 285, 290 (2014) (proper question for minimum contacts "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way"); *Fireman's Fund Ins.*, 703 F.3d at 493 (question is whether "the defendant purposefully availed itself of the privilege of conducting activities within the forum State" (cleaned up)).

This focus on the defendant's conduct is required by Due Process, and there is no exception for Internet-based allegations. Maintaining a website or web-based service "does not . . . subject the operator to personal jurisdiction, even for actions relating to the site, simply because it can be accessed by residents of the forum state." *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011). It is well-established that "clicks, visits, and views from forum residents cannot alone show purposeful availment." *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021). Instead, courts consider whether the "defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff" there. *Schrader*, 633 F.3d at 1241.

Consistent with these principles, numerous courts have held—as to Meta specifically—that activities by Meta's users in a given state do not, as a matter of law, establish personal jurisdiction over Meta in that state. *See Harrison v. Facebook, Inc.*, 2019 WL 1090779, at *4 (S.D. Ala. Jan. 17, 2019) (general accessibility of Facebook's website or mobile application insufficient for specific

jurisdiction), *report and recommendation adopted*, 2019 WL 1102210 (S.D. Ala. Mar. 8, 2019); *Georgalis v. Facebook, Inc*., 324 F. Supp. 3d 955, 960 (N.D. Ohio 2018) ("Facebook's ubiquitous presence and numerous Ohio users, alone, do not constitute sufficient contacts"); *Ralls v. Facebook*, 221 F. Supp. 3d 1237, 1242-44 (W.D. Wash. 2016) (personal jurisdiction over Facebook did not exist "simply because a user avail[ed] himself of Facebook's services" in Washington); *Gullen v. Facebook.com, Inc*., 2016 WL 245910, at *2 (N.D. Ill. Jan. 21, 2016) ("the fact that its site is accessible to Illinois residents does not confer specific jurisdiction over Facebook"); *Facebook, Inc. v. K.G.S.*, 294 So. 3d 122, 140 (Ala. 2019) (same).[3]

Were the rule otherwise, providers of internet communication services would be subject to personal jurisdiction in all 50 states, based solely on the conduct of third-party users. The case law squarely rejects that result. *See Walden*, 571 U.S. at 284 ("[T]he relationship must arise out of contacts that the 'defendant **himself**' creates with the forum State.") (emphasis in original); *XMission*, 955 F.3d at 844 (personal jurisdiction does not turn on a plaintiff-user's forum-related activities; otherwise "the defense of personal jurisdiction . . . would no longer exist" (citing *Shrader*, 633 F.3d at 1240)); *Doshier*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019) (the contacts with "the forum state must be contacts that [the social media service] . . . creates, not the unilateral activity of persons other than the defendant").

The Court should therefore dismiss the State's claims for lack of personal jurisdiction.

---

[3] These decisions comport with cases across the country holding that users' conduct cannot establish personal jurisdiction over social media services. *See, e.g.*, *State v. Tiktok, Inc*., 2023 WL 4305656, at *10 (Ind. Super. May 04, 2023) (rejecting argument that TikTok was subject to personal jurisdiction based on "substantial" Indiana user base); *Doshier*, 417 F. Supp. 3d at 1178(no specific jurisdiction over Twitter where "the only facts alleged in the complaint that provide a link to Arkansas describe actions taken by plaintiffs").

II.    **SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS THE STATE'S CLAIMS.**

The State's claims are also barred by Section 230 because they seek to impose liability on Meta for harms allegedly resulting from third-party content on its services.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  Enacted to "forbid the imposition of publisher liability" that could chill an internet service's "exercise of its editorial" activity, the law establishes broad "federal immunity to ***any state law cause of action*** that would hold computer service providers liable for information originating with a third party." *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 984-85, 986 (10th Cir. 2000) (emphasis added).  As the Fourth Circuit explained in the seminal Section 230 case, "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium" and "made a policy choice" to "immunize service providers" that "serve as intermediaries" for others' speech so as "to avoid any such restrictive" "chilling effect." *Zeran v. Am. Online*, 129 F.3d 327, 329, 330-31 (4th Cir. 1997).  To this end, Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc).  Courts thus apply Section 230 immunity to dismiss claims at the pleading stage.  *See Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*, 591 F.3d 250, 254–55 (4th Cir. 2009).

By its terms, Section 230 immunity applies with full force to state law claims, including the claims the State asserts here for unfair and deceptive trade practices, and public nuisance.  The statute contains an express and broad preemption provision under which "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this

section [230]."  47 U.S.C. § 230(e)(3).  And courts have read this provision per its broad language to cover state claims like those alleged here.  *See Hill v. StubHub, Inc.*, 727 S.E.2d 550 (N.C. Ct. App. 2012) (claims for unfair or deceptive trade practice); *Daniel v. Armslist, LLC*, 386 Wis. 2d 449, 483 (2019) (public nuisance claim based on dissemination of allegedly harmful third-party content); *see also Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1266, 1268-71 (D.C. Cir. 2019) ("unfair competition" and "false advertising" claims); *Shiamili v. Real Estate Grp. of N.Y., Inc.*, 952 N.E.2d 1011 (N.Y. 2011) (unfair competition claims).

Nor is there any exception to Section 230 immunity when these claims are brought by state attorneys general.  *See, e.g.*, *Free Speech Coal., Inc. v. Colmenero*, __ F. Supp. 3d __, 2023 WL 5655712, at *26 (W.D. Tex. Aug. 31, 2023) (applying "clear" text of Section 230 to bar state AG claims); *Google, Inc. v. Hood*, 96 F. Supp. 3d 584, 597 (S.D. Miss. 2015) (same), *vacated and remanded on other grounds*, 822 F.3d 212 (5th Cir. 2016) (but affirming same).  "[W]hat matters is not the name of the cause of action" or the identity of the claimant, but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009).

Section 230 immunity applies where: (1) the defendant is a "provider . . . of an interactive computer service," and (2) the claim seeks to hold the defendant liable for its activities as a "publisher or speaker" of (3) content provided by someone else.  *Silver v. Quora, Inc.*, 666 F. App'x 727, 729-30 (10th Cir. 2016).  Meta is entitled to dismissal of the State's claims because each element is met.

### A.    Meta Is an Interactive Computer Service Provider.

Meta meets the first Section 230 element because it is a "provider . . . of an interactive computer service."  47 U.S.C. § 230(f)(2).  Section 230 defines "interactive computer services" to include "any information service, system, or access software provider that provides or enables access by multiple users to a computer server."  *Id.*  Courts uniformly agree that Meta's services meet this

13

definition because users access those services to share and obtain information. *See, e.g.*, *Sekiya v. Facebook*, 2017 WL 3588816, at *2 (D.N.M. Jan. 3, 2017) (Facebook); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (Facebook); *Dangaard v. Instagram, LLC*, 2022 WL 17342198, at *4 (N.D. Cal. Nov. 30, 2022) (Facebook and Instagram); *Winter v. Facebook, Inc.*, 2021 WL 5446733, at *4 (E.D. Mo. Nov. 22, 2021) (Facebook); *La'Tiejira v. Facebook*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017) (Facebook); *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156 n.10 (E.D.N.Y. 2017) (Facebook).

## B.   The State Seeks to Hold Meta Liable as a "Publisher or Speaker."

Section 230 "mandates dismissal if . . . the complaint seeks to hold Facebook liable as [a] 'publisher or speaker' of third-party content." *Klayman*, 753 F.3d at 1357; *Johnson v. Arden*, 614 F.3d 785, 791–92 (8th Cir. 2010) (Section 230 applies to "any cause of action that would make service providers liable for information originating with a third-party user of the service") (cleaned up). Claims meet this test if they would "hold a service provider liable for" publishing functions, such as "deciding whether to publish, withdraw, postpone or alter content," *Johnson*, 614 F.3d at 792 (cleaned up), "arranging and distributing third-party information," *Force*, 934 F.3d at 66, or "reviewing," "editing," and "withdraw[ing]" content, *Barnes*, 570 F.3d at 1102.

Courts have repeatedly held that Section 230(c)(1) bars claims based on recommendation algorithms and so-called "design choices" through which social media companies organize or curate the third-party content users see, and how that content is displayed to them. *See Force*, 934 F.3d at 66. Thus, in *Dyroff v. Ultimate Software Grp., Inc.*, the court held that Section 230 barred claims challenging "algorithms" used to "analyze user posts" and "recommend[]" content to users, because "tools meant to facilitate the communication and content of others" constitute "publish[ing]." 934 F.3d 1093, 1098 (9th Cir. 2019). And in the ongoing federal MDL addressing claims comparable to those the State asserts here, the court held that Section 230 barred claims against social media

services, including Meta, based on the alleged "[u]se of algorithms to promote addictive engagement," the failure to impose "protective limits to the length and frequency of sessions," the failure to impose "blocks to use during certain times of day," the failure to "provid[e] a beginning and end to a user's 'Feed'," the publication of "geolocating information for minors," "[r]ecommending minor accounts to adult strangers," "[l]imiting content to short-form and ephemeral content," and the "[t]iming and clustering of notification of third-party content in a way that promotes addiction."  *In re Soc. Media Adolescent Addiction/Personal Injury Prods. Lia. Litig.*, 2023 WL 7524912, at *14-16 (N.D. Cal. Nov. 14, 2023) (hereafter "*In re Soc. Media Litig.*").  *See also Anderson v. TikTok, Inc.*, 637 F. Supp. 3d 276, 280 (E.D. Pa. 2022) (allegations attacking TikTok's algorithm were protected by Section 230 because they were premised on the "manner in which [TikTok] ***published*** a third party's dangerous content") (emphasis added)

Here, the State's claims impermissibly treat Meta as a publisher of third-party content. Specifically, the FAC seeks to hold Meta liable for (1) allegedly failing "to restrict access to" harmful content created by users and shared with other users, and (2) allegedly making design choices that affect how user-generated content is organized, displayed and disseminated on Facebook, Instagram and WhatsApp.  FAC ¶ 516.  The State's claims are barred by Section 230 because they seek to impose liability on Meta for its activities in publishing third-party content, as explained further below.

***CSAM and Other Exploitative Content.***  The State seeks to hold Meta liable for third-party content shared by users on its services that allegedly relates to CSAM, human trafficking and other exploitative or offensive content.  *See, e.g.*, FAC ¶ 94 (alleging that "Meta's platforms contain account after account . . . depicting" CSAM and other illicit content); *see also id.* ¶¶ 1-2, 76, 102-73, 231, 243-45, 251-53, 425, 437-454, 520.

As the State admits, Meta's policies prohibit this type of reprehensible content, FAC ¶ 75 & n.22, and Meta takes actions to remove and report it where appropriate.  But the State's claims that Meta failed to review and remove some of this third-party content from its services would impose liability on Meta for these activities, thereby treating it as a ***publisher*** of such content—something that Section 230 does not allow.  Section 230 immunizes interactive computer service providers from claims that they "failed to remove" content because imposing such liability "necessarily involves treating" the service "as a publisher of the content it failed to remove." *Barnes*, 570 F.3d at 1103 ("removing content is something that publishers do"); *Silver v. Quora, Inc.*, 2016 WL 9777159, at *3-4 (D.N.M. June 13, 2016), *aff'd* 666 F. App'x 727 (10th Cir. 2016) (dismissing under Section 230 plaintiff's claim that turned "entirely on Quora's decision not to remove the allegedly defamatory statements").[4]

Section 230 thus bars the State's claims that seek to treat Meta as the "publisher" of third-party content, including CSAM or other alleged illicit content.  "The national consensus is that all claims against internet companies stemming from their publication of information created by third parties effectively treat the defendants as publishers and are barred" by Section 230.  *In re Facebook*, 625 S.W.3d 80, 90 (Tex. 2021) (quotation omitted) (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).  Section 230 "'establishes a general rule' that web service providers may not be held 'legally responsible for information created by third parties if such providers merely enabled that content to be posted online.'"  *In re Facebook*, 625 S.W.3d at 90 (quoting *Nemet Chevrolet*, 591 F.3d at 254).  Thus, Meta cannot be held liable for acting as the "intermediar[y] for other parties' . . . injurious messages," *Zeran*, 129 F.3d at 330-31, even where the third-party content is

---

[4] In addition, holding Meta liable for failing to remove third-party CSAM or CSEC content it has not reviewed would be inconsistent with 18 U.S.C. § 2258A(f), which makes clear that providers of communication services like Meta are not required to search, screen or scan for such content.

"abusive," *Bride v. Snap Inc.*, 2023 WL 2016927, at *6 (C.D. Cal. Jan. 10, 2023), or includes other harmful messaging, *see Force*, 934 F.3d at 65 (providing Hamas a means to bring its "message to interested parties . . . falls within the heartland of what it means to be the 'publisher'").

Accordingly, courts have held that Section 230 bars claims that seek to hold interactive computer service providers liable for the harmful effects of third-party content posted on their services, even where the plaintiffs tried to style the claims as a failure to prevent exposure to such content—such as a failure "to ensure that sexual predators do not" interact with young users, *Doe II v. MySpace, Inc.*, 175 Cal. App. 4th 561, 573 (2009), allowing content that facilitates child sex crimes, *L.W. v. Snap Inc.*, 2023 WL 3830365, at *5 (S.D. Cal. June 5, 2023), *see also Doe v. Grindr*, __ F. Supp. 3d __, 2023 WL 9066310, at *3 (C.D. Cal. Dec. 28, 2023), or failing to exclude third-party "child pornography," *Doe #1 v. Twitter, Inc.*, 2023 WL 3220912, at *2 (9th Cir. May 3, 2023). Thus, in *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1141 (9th Cir. 2022), the court held—and the plaintiffs did not dispute—that Section 230 immunity barred claims that Reddit "provides a platform that is easy to share child pornography, highlights subreddits that feature child pornography to sell advertising on those pages, allows users who share child pornography to serve as subreddit moderators, and fails to remove child pornography even when users report it" (unless those claims were subject to an exemption from Section 230 that is not asserted here). Section 230 likewise bars the State's claims that Meta failed to monitor and remove all alleged CSAM and other exploitative or harmful content. *Barnes*, 570 F.3d at 1103; *see also L.W.*, 2023 WL 3830365, at *4. Parties harmed by such content "may sue the third-party user who generated the content, but not the

interactive computer service that enabled them to publish the content online." *Doe v. MySpace, Inc.*, 528 F.3d. at 419.[5]

*App Features.* The State identifies several "features" that it alleges contribute to harms suffered by young users of Facebook, Instagram and WhatsApp—namely, algorithms, FAC ¶¶ 26, 54, 310-23; "infinite scroll," *id.* ¶¶ 324-28; push notifications, *id.* ¶¶ 329-36; "ephemeral content," *id.* ¶¶ 337-43; "autoplay" and "Reels," *id.* ¶¶ 344-49; and "image filters," *id.* ¶¶ 351-54. The allegations about these design features—all of which involve ways that Meta's services organize, arrange and present third-party content to users—make clear that the State seeks to impose liability for Meta's conduct as a publisher of third party-content. *See id.* ¶ 318 (Meta's "algorithms suffer from a fatal flaw—they do not distinguish between permissible and impermissible ***content***" (emphasis added)); *id.* ¶ 324 (Facebook and Instagram feeds show "a portion of the next piece of ***content***, which the user is thereby enticed to view" (emphasis added)); *id.* ¶ 330 ("Push notifications may be sent for a variety of activity, including when ***another user*** follows them, or likes or comments on their post." (emphasis added)); *id.* ¶ 337 (ephemeral "***content*** elicits a prompt response and increases user engagement" (emphasis added) (internal citations and quotation omitted)); *id.* ¶ 344 ("Like other ***content***, Reels display 'likes,' follows, comments and views of a particular video." (emphasis added)); *id.* ¶ 351 (image filters allow "users to ***modify their pictures***," *i.e.*, content, "by altering their appearances in photos and videos"); *id.* ¶ 410 (Meta's "***decisions to implement (or not to implement) features*** in order to maximize teen engagement and profits caused real and lasting harm to young users" (emphasis added)).

---

[5] Meta's motion to dismiss on Section 230 grounds claims predicated on CSAM content is currently pending before the MDL court. *See* Case No. 4:22-md-03047-YGR (N.D. Cal.), ECF No. 516.

As courts have repeatedly held, such challenges to the "structure and operation of [a] website," including "features that are part and parcel of [its] overall design and operation," all "reflect choices about what content can appear on the website and in what form" and thus "fall within the purview of traditional publisher functions." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016)). *Accord Nemet*, 591 F.3d at 256–57 (Section 230 protects website's "structure and design"); *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 328 (E.D.N.Y. 2018) (Section 230 protects "features" that "are part and parcel of the overall design and operation of the website" (quotation omitted)), *aff'd in relevant part*, 934 F.3d 53 (2d Cir. 2019).

Claims based on Meta's alleged "design choices" about how content is organized, displayed and arranged for users thus seek to impose liability on Meta for its activities as the publisher of third-party content. *See, e.g.*, *Force*, 934 F.3d at 70 ("[A]rranging and displaying others' content to users of Facebook through such algorithms—even if the content is not actively sought by those users—is not enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content.").

As the MDL court held recently, claims based on alleged design features such as notifications to "alert users to third-party content," "[n]ot providing a beginning and end to a user's 'Feed,'" and "[l]imiting content to short-form and ephemeral content" "directly target defendants' roles as publishers of third-party content and are barred by Section 230." *In re Soc. Media Litig.*, 2023 WL 7524912, at *16. It "has been the unanimous view of other courts [that] claims alleging that defectively designed internet products allowed for transmission of harmful third-party communications" are barred by Section 230. *In re Facebook*, 625 S.W.3d at 94. *See also L.W.*, 2023 WL 3830365, at *4 (dismissing claims focused on Snapchat's "ephemeral design features, specifically the disappearing messages"); *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex.

July 7, 2022) (Section 230 barred claim that Snapchat "allows messages to automatically delete after a short period of time"); *Fed. Trade Comm'n v. Match Grp., Inc.*, 2022 WL 877107, at *7–8 (N.D. Tex. Mar. 24, 2022) (notifications); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021) (filters), *aff'd in relevant part sub. nom.*, *Doe #1*, 2023 WL 3220912; *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (comments and likes); *Doe v. Grindr Inc.*, 2023 WL 9066310, at *3 (C.D. Cal. Dec. 28, 2023) (age verification and user matching functions).

   ***Failure to Warn/Alleged Misrepresentations by Omission.***  The State's claims that Meta failed to disclose or provide warnings regarding the potential for encountering exploitative content or the alleged effects of Meta's app features, *see, e.g.*, FAC ¶ 501, also would impose liability on Meta for its activities in organizing and disseminating third-party content and are thus barred by Section 230 immunity.  Any other rule would render Section 230 a dead letter, as plaintiffs could simply repackage impermissible claims involving alleged harm from third-party content as a claim that social media services failed to warn about the content they are publishing.  *See Kimzey*, 836 F.3d at 1265-66 (no amount of "creative pleading" allows plaintiffs to "advance the same basic argument that the statute plainly bars").  For that reason, courts have consistently dismissed failure-to-warn claims where, as here, the claims are "inextricably linked" to a service's "alleged failure to edit, monitor, or remove" third-party content.  *Herrick v. Grindr, LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) ("requiring [an interactive computer service] to post a warning at the outset or along with each profile is no different than requiring [the service] to edit the third-party content itself"); *In re Facebook, Inc*., 625 S.W.3d at 93 ("Regardless of whether Plaintiffs' claims are couched as failure to warn, negligence, or some other tort of omission, any liability would be premised on second-guessing of [service's] 'decisions relating to the monitoring, screening, and deletion of [third-party] content . . . .'"); *Doe v. Grindr Inc.*, 2023 WL 9066310, at *5 (Section 230 barred "defective warning

claims" because they were "not materially different from the product liability claims . . . as they also rely on published content from App users."). The same logic applies to consumer protection claims premised on the same theory of liability. *See Bride*, 2023 WL 2016927, at \*7 (dismissing statutory false advertising claims "for the same reason as Plaintiffs' failure to warn claims: because they are all predicated on allegations concerning activity immunized by Section 230"). The second Section 230 element is satisfied.

### C.     The State's Claims Treat Meta as the Publisher of Third-Party Content.

The final element for Section 230 immunity is met because all of the State's claims treat Meta as a publisher of ***third-party*** content. *First*, the State acknowledges that third-party users of Meta's services—not Meta—created the alleged content at issue in the Amended Complaint. *See* FAC ¶¶ 48-66. There is no allegation that Meta created ***any*** of the challenged content. *See, e.g., id.* ¶ 63 (explaining that "posts on a user's feed consist of posts from other users who have been followed by the user viewing his or her feed" and "suggested posts" from other users that person has not followed—*i.e.*, not content created by Meta), ¶ 327 (noting that the "infinite scroll feature" shows users posts from accounts they do and do not follow, rather than content generated by Meta). Without any allegation that Meta ***created*** any allegedly harmful content, the State's claims "boil[] down" to targeting Meta for ***publishing*** it. *Roommates*, 521 F.3d at 1170-71.

*Second*, the State cannot evade Section 230 immunity merely by asserting that its Amended Complaint "takes aim at the design of Meta's algorithm" rather than at Meta's role as a publisher of third-party content. FAC ¶ 26. As the State acknowledges, it "takes aim" at Meta's algorithm ***because*** that algorithm allegedly enables Meta's services "to recommend ***content and other users*** aligned with [a user's] interests." *Id.* (emphasis added); *see also id.* at ¶ 54 ("Meta's algorithms for identifying and delivering ***content*** to users' feeds is driven by engagement, or how much the specific content is viewed." (Emphasis added.)). That describes the process of organizing and presenting

third-party content to users—core publishing activity subject to Section 230 immunity.  Thus, courts have repeatedly held that a social media service's development and use of design features like algorithms to organize, display and disseminate third-party content to users does not make it the creator or developer of that content.  *See, e.g.*, *Force*, 934 F.3d at 70 ("arranging and displaying others' content to users of Facebook through such algorithms—even if the content is not actively sought by those users—is not enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content"); *Kimzey*, 836 F.3d at 1270 ("proliferation and dissemination of content does not equal creation or development of content"); *Dyroff*, 934 F.3d at 1098 ("features and functions" such as "algorithms," "recommendations[,] and notifications," are "tools meant to facilitate the communication and content of others," and not "content in and of themselves"); *Doe v. Grindr*, 2023 WL 9066310, at *4 ("functions, operations, and algorithms" are "editorial choices, made to facilitate the communication of others"); *accord In re Soc. Media*, 2023 WL 7524912, at *15-16 ("Section 230 bars the claims as to the recommendation algorithms").

In short, because the State's claims seek to impose liability on Meta by treating it as a publisher of third-party content, they are barred by Section 230.

## III.   THE FIRST AMENDMENT BARS THE STATE'S CLAIMS SEEKING TO HOLD META LIABLE FOR ITS CONTENT POLICIES.

The First Amendment separately provides broad protection for the exercise of editorial discretion by a publisher in organizing and displaying information generated by third parties.  To the extent the State's claims seek to hold Meta liable for its content policies and other editorial functions associated with the curating and posting of third-party content, they are barred by the First Amendment.  Courts have also recognized the "devastatingly broad chilling effect" of claims based on protected speech and routinely dismiss such claims at the pleadings stage.  *Watters v. TSR, Inc.*, 715 F. Supp. 819, 822 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990).

22

The State alleges that Meta violated the UPA and is liable for public nuisance because of the allegedly harmful consequences of users' exposure to third-party content that Meta purportedly allows to be posted or shared by users via its services, despite its stated policies prohibiting such content, and because of the alleged harm to corporations whose advertisements allegedly appeared near such content. *See, e.g.*, FAC ¶¶ 1-2, 48-60, 62-67, 76, 174, 251-53, 437-454, 520. But "the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 570 (1995). This includes "the exercise of editorial control and judgment" over content generated by others. *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994).

That constitutional protection fully applies to claims challenging social media companies' content policies—including, as here, the alleged failure to implement or enforce policies prohibiting harmful content and the use of algorithmic recommendations to display content to users. Courts have recognized that decisions by social media services "about what content to include, exclude, moderate, filter, label, restrict, or promote" "are protected by the First Amendment." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022)), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). *See, e.g.*, *Alario v. Kndusen*, 2023 WL 8270811, at *6 (D. Mont. Nov. 30, 2023) (TikTok's "decisions related to how it selects, curates, and arranges content are . . . protected by the First Amendment"); *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3, n.3 (N.D. Cal. Jan. 12, 2022) (allegations that algorithms manipulated viewers "into watching content that was deeply harmful to them" were about speech because "[w]ithout the content, there would be no claim" (cleaned up)). As the court noted in *O'Handley*, social media services have "important

First Amendment rights that would be jeopardized" if a court were to dictate "what content-moderation policies to adopt and how to enforce those policies." 579 F. Supp. 3d at 1187–88.[6]

Under these settled principles, the First Amendment bars the State's claims that Meta failed to adequately enforce its content policies against harmful content, should have had more restrictive content policies, employed algorithms that displayed allegedly harmful content to some users, or published certain content near certain advertisements. *See, e.g.*, FAC ¶¶ 48-60, 62-67, 76, 442-54. These allegations unambiguously challenge Meta's protected activities in developing and implementing its policies under which it displays or permits third-party content. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("creation and dissemination of information are speech within the meaning of the First Amendment"); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("if the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category") (cleaned up). In short, the State's claims are barred by the First Amendment because they would impermissibly require the Court to dictate "what content-moderation policies" Meta must adopt and to tell it "how to enforce those policies." *O'Handley*, 579 F. Supp. 3d at 1187–88. "[C]ontent-moderation activities qualify as First-Amendment-protected expressive conduct." *NetChoice, LLC v. Att'y Gen., Fla. (NetChoice)*, 34 F.4th 1196, 1214 (11th Cir. 2022), *cert. granted*, Nos. 22-277, 22-393.

---

[6] Numerous courts have held that the First Amendment bars claims against publishers of third-party content that is alleged to have harmed those exposed to it. *See, e.g.*, *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987) (barring claim by parents of minor who committed suicide after reading magazine article); *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (1988) (barring claims against publisher of heavy metal music alleging that songs drove listener to suicide); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) (barring claim alleging that addictive and violent nature of video game caused stabbing by minor); *DeFilippo v. Nat'l Broad. Co.*, 446 A.2d 1036 (R.I. 1982) (barring claim alleging minor killed himself by emulating a simulated hanging from a television show); *Walt Disney Prods., Inc. v. Shannon*, 276 S.E.2d 580 (Ga. 1981) (barring claim that 11-year-old hurt himself by copying activity from Disney television program).

Separately, the First Amendment bars the State's claims based on various "deceptive" and "unconscionable" practices alleged in Counts I and III of the FAC, some of which turn on supposed "misrepresentations" to Congress in response to direct questions.  See FAC ¶¶ 323, 458-59.  That is because the First Amendment bars claims based on a defendant's efforts to petition the government, including Congressional testimony, even when the defendant's statements are allegedly false.  *See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000); *see also Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 297 (8th Cir. 1978) (First Amendment precludes liability for allegedly false statements to governmental body); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (same); *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1058 (9th Cir. 1998) (same).

## IV.    THE STATE CANNOT ESTABLISH THE ELEMENTS OF A PUBLIC NUISANCE CLAIM UNDER NEW MEXICO LAW.

New Mexico follows the Restatement (Second) of Torts' definition of public nuisance: an "unreasonable interference with a right common to the general public."  *City of Sunland Park v. Harris News, Inc.*, 2005-NMCA-128, ¶ 40, 124 P.3d 566 (quoting *State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque*, 1994-NMSC-126, ¶ 52, 889 P.2d 185); *see* Restatement (Second) of Torts § 821B (1979).

The State does not and cannot plead a public nuisance claim under this standard, because it cannot allege facts that, if true, would establish an interference with a "right common to the public"— as opposed to alleged interferences with the well-being of individual users of Meta's services. Further, under New Mexico law, the tort of public nuisance has been confined to interferences with land, water, air or other public resources, ***not*** to lawful services that allegedly cause harm to individual users.  The State's claim would unreasonably expand the scope of public nuisance law

and should be rejected.  Finally, the State cannot establish proximate causation, a required element of a public nuisance claim.

### A.   The State Cannot Establish an Unreasonable Interference with a "Right Common to the Public."

New Mexico, like virtually every state, requires that a public nuisance claim involve an interference with a "right common to the general public." *Village of Los Ranchos*, 1994-NMSC-126, ¶ 52, 889 P.2d 185 (a public nuisance is an "unreasonable interference with a right common to the general public" (quoting Restatement (Second) of Torts § 821B(1) (1979))).  "This public right is one common to—belonging to—'all members of the general public.'"  *Id*. ¶ 52 (quoting Restatement (Second) of Torts § 821B cmt. g).  A right "common to the public" is "collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured."  Restatement (Second) of Torts § 821B cmt. g.

It is not enough that conduct interferes with the rights of "a large number of persons."  *State ex rel. Smith v. Riley*, 1997-NMCA-063, ¶ 8, 942 P.2d 721(quoting Restatement (Second) of Torts § 821B cmt. g).  Instead, to constitute a public nuisance, a defendant's conduct must interfere with a public right shared **equally** by **all** members of the public, such as access to air, water or rights-of-way.  *See id.*; *accord Vill. of Los Ranchos de Albuquerque*, 1994-NMSC-126, ¶ 52; *see also State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 726 (Okla. 2021) ("a public right is a right to . . . **an indivisible resource** . . . like air, water, or public rights-of-way") (emphasis added).

The State alleges that "[t]he unlawful and unreasonable conduct by the Defendants has created and/or facilitated [certain alleged] hazards to public health and safety," such as "Internet-facilitated human trafficking, distribution of CSAM and other illicit material over the internet, and social media addiction and its impact on the social and mental wellbeing of New Mexico teens and adolescents."  FAC ¶ 548.  While the State's allegation of "public health and safety" hazards is

26

unsupported, alleged adverse effects on the "social and mental wellbeing" of individual users of Meta's services does not in any event establish an interference with a right "common to the public."

This principle is reflected in the decision of the Rhode Island Supreme Court in *State v. Lead Indus. Ass'n*, 951 A.2d 428, 448 (R.I. 2008).  There, the court recognized that "lead poisoning constitutes a public health crisis that has plagued and continues to plague this country, particularly its children." *Id.* at 436.  But because the harms from lead poisoning arose from the exposure of individual children to lead paint, and thus involved a cumulation of adverse health effects on specific individuals, the court held that the marketing and distribution of lead-based paint did not interfere with a "public right" as compared to the aggregation of individual rights of each person to avoid physical harm.  *See id.* at 448 ("a public right is more than an aggregation of private rights by a large number of injured people").

Other courts have similarly rejected public nuisance claims predicated on undisputed and significant public health and safety crises arising from individual exposure to lead paint, firearms, asbestos and cold medicine, among other examples.[7]  For example, the Oklahoma Supreme Court recently dismissed public nuisance claims based on the manufacture and distribution of prescription opioids because the adverse health effects of opioid addiction and overdose involved harms to individual users of opioids, not an interference with rights "common to the public." *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d at 726.

---

[7] *See, e.g.*, *In re Lead Paint Litig.*, 924 A.2d 484, 505 (N.J. 2007) (lead paint); *City of Chicago v. Beretta USA Corp.*, 821 N.E.2d 1099, 1148 (Ill. 2004) (handguns); *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 138 (Conn. 2001) (handguns); *Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000) (tobacco); *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 522 (Mich. Ct. App. 1992) (asbestos); *Ashley Cnty., v. Pfizer, Inc.*, 552 F.3d 659, 671–72 (8th Cir. 2009) (cold medicine).

The rights at issue here fall within the category of individual private rights, not rights "common to the public," because the State's allegations all involve purported harms to individual users of Meta's services. These include individuals allegedly harmed by Meta's "platform design," FAC ¶¶ 3–4, 295, 300, 309-59, by purportedly "false or misleading oral or written statements, visual descriptions, or other representations," *id.* ¶ 498; *see also id.* ¶¶ 459, 483, 500, 503, and by alleged harms from exposure to illicit third-party content, *id.* ¶¶ 76-77, 79, 81, 95, 100, 102-73, 174, 187-88, 195, 200, 202. Such allegations, based on alleged harms to individuals who were purportedly misled or harmed by the features of social media services, or allegedly exposed to harmful content on those services, involve individual rights to be free from harm, not rights "common to the public" that can establish a public nuisance claim. *See Lead Indus.*, 951 A.2d at 448 ("a public right is more than an aggregate of private rights by a large number of injured people"); *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126 (Ill. App. Ct. 2005) (a public nuisance requires more than an interference with "an assortment of claimed private individual rights").

Accordingly, the State's public nuisance claim must be dismissed because the State cannot establish the required interference with a right "common to the public." *See Village of Los Ranchos*, 1994-NMSC-126, ¶ 52.

**B.      New Mexico Public Nuisance Law Does Not and Should Not Apply to Meta's Alleged Conduct.**

The State alleges that Meta's services—provided through software applications Meta developed and makes available to users—have been used by some bad actors for harmful purposes, and that this constitutes a public nuisance. But no New Mexico case has ever held that the provision of a lawful service constitutes a public nuisance. To permit the State's public nuisance claim to proceed would run contrary to centuries of public nuisance jurisprudence in New Mexico and elsewhere, which has traditionally involved claims of interference with land, air, water and other

public resources.  The Court should reject such a dramatic expansion of New Mexico law, which finds no foundation in the principles and boundaries of public nuisance law.

In particular, New Mexico's common law on public nuisance has been addressed to interferences with land and public resources such as air and water, not harms allegedly caused by the design and provision of lawful services.  *See, e.g.*, NMSA. 1978, § 30-8-1 (examples of "public rights" include "the right to use public property"); *State ex rel. Smith*, 1997-NMCA-063, ¶ 8 (public rights include "a right to fish" in a navigable stream); *Town of Clayton v. S. D. Mayfield*, 1971-NMSC-061, 485 P.2d 352 (operation of an unfenced junkyard that constituted a fire and health hazard was a public nuisance); *State ex rel. New Mexico Water Quality Control Comm. v. City of Hobbs*, 1974-NMSC-064, 525 P.2d 371 (operation of sewage treatment plant that contaminated underground water constituted a public nuisance).  The State's public nuisance claim stands far outside those conventional boundaries and does not remotely resemble the types of public nuisance claims traditionally permitted by New Mexico courts. Courts have rejected efforts to expand public nuisance law in ways that would "strai[n] the law to absurdity."  *Camden Cty. Bd. of Chosen Freeholders*, 273 F.3d at 540 (citing W. Page Keeton et al., Prosser and Keeton on Torts § 86 at 617-18 (5th ed. 1984)).[8]  This Court should likewise reject the State's attempt to dramatically expand the

---

[8] *See, e.g.*, *City of Huntington v. AmerisourceBergen*, 609 F. Supp. 3d 408, 474 (S.D.W. Va. 2022) ("a public right so broad and undefined would subject any potentially dangerous instrumentality to suit," making public nuisance "a monster that would devour in one gulp the entire law of tort"); *Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993) (same); *In re Lead Paint Litig.*, 924 A.2d at 505 (observing that plaintiffs' nuisance theory would "vest the public entities with a general tort-based remedy" or would "create an ill-defined claim that would essentially take the place of [existing] enforcement, abatement, and public health funding scheme[s]"); *District of Columbia v. Beretta, U.S.A. Corp.*, 872 A.2d 633, 650–51 (D.C. 2005) (en banc) (declining to adopt "a right of action for public nuisance applied to the manufacture and sale of guns"); *City of Chicago*, 821 N.E.2d at 1116 (expressing reluctance to countenance a cause of action "so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it"); *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S. 2d 192, 196 (App. Div. 2003) ("[G]iving a green light to a common-law public (continued…)

scope of New Mexico public nuisance law by extending it to the provision of lawful social media services—something no authority in New Mexico supports, and no New Mexico court has ever done.

### C. The State Cannot Establish that Meta's Alleged Conduct Is a Proximate Cause of the Alleged Injuries.

Separate and apart from the defects in the State's public nuisance claim addressed above, the claim should also be dismissed because the Amended Complaint does not allege facts showing that Meta's conduct was the proximate cause of the harms alleged.

Causation is an essential element of a public nuisance claim. *See Firstenberg v. Monribot*, 2015-NMCA-062, ¶ 14, 350 P.3d 1205, 1212 (affirming summary judgment of nuisance claim for absence of evidence of causation); *see also, e.g.*, *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 666, 668 (8th Cir. 2009) (affirming dismissal of public nuisance and ADTPA claims under Arkansas law where allegations failed to establish proximate causation). Proximate cause is defined as "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, and without which the injury would not have occurred." *N.M. State Highway Dep't v. Van Dyke*, 1977-NMSC-027, ¶ 9, 563 P.2d 1150, 1153 (citation and quotation marks omitted).

Where a defendant's conduct is unduly remote and attenuated from the alleged injuries— such as here, where Meta's conduct is attenuated from the alleged harm by the independent actions of multiple third parties occurring over time—proximate causation cannot be established.[9] As the

---

nuisance cause of action today will, in our judgment, likely open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities."); *City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882, 910 (E.D. Pa. 2000) ("The refusal of many courts to expand public nuisance law to the manufacturing, marketing, and distribution of products conforms with the elements of public nuisance law."), *aff'd*, 277 F.3d 415 (3d Cir. 2002); *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806 (Del. Super. Dec. 1, 2000) (dismissing public nuisance claim based on "negligent marketing, promotion and distribution of handguns").

[9] Where, as here, the State's allegations, accepted as true, establish that Meta's conduct is unduly remote from the alleged injuries to establish proximate causation, "[a] court may decide questions (continued…)

Supreme Court has noted, it is a "well established principle of the common law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014)).  For this reason, "foreseeability alone does not ensure the close connection that proximate cause requires." *Id*. at 1306.[10]

The State's own allegations establish that Meta's alleged conduct is remote and multiple steps removed from the alleged injuries, which could occur—as alleged by the State—only through the independent actions of third parties.  Though the State attempts—in conclusory and speculative fashion—to draw a connection between use of Facebook and Instagram and a decline in adolescent mental health or an increase in alleged criminal sexual activity, these alleged harms—if connected at all to online activity—arise from the independent actions of third parties who provided the alleged harmful content, undertook independent bad acts, and who act completely unrelated to Meta.  This is not "the close connection that proximate cause requires." *Bank of Am.*, 137 S. Ct. at 1306.

For example, the State alleges that Meta's design features are implicated in alleged sexual exploitation and harm to minors' mental health, but alleges only that those harms were caused by the actions of multiple third parties and circumstances that occur over time in ways that are clearly attenuated from Meta's claimed conduct.  *See, e.g.*, FAC ¶ 4, 29.  The State alleges at length that the claimed harms arise from the actions of third-party bad actors who traffic in CSAM and sexual crimes, including users who violate federal and state law and Meta's terms of service to solicit or purchase CSAM.  *See id.* ¶¶ 79-147, 149-173.  The State also alleges that users view content related

---

[10] Although the specific issue in *Bank of America Corp.* involved proximate causation under a federal statute, the Supreme Court's analysis was based on "principle[s] of the common law."  137 S. Ct. at 1305.

of . . . proximate cause, if no facts are presented that could allow a reasonable jury to find proximate cause." *Calkins v. Cox Estates*, 1990-NMSC-044, ¶ 18, n.6, 792 P.2d 36.

to self-harm posted by third parties.  *See id.* ¶¶ 147-48.   These allegations, in other words, demonstrate that Meta's alleged conduct—accepted as true on this motion to dismiss—is too remote from the alleged harms to establish proximate causation.

*Ashley County* demonstrates the point.  There, public nuisance claims were brought against cold medicine manufacturers, who allegedly knew that their drugs were being used to make methamphetamine.  Despite that allegation, the court found there was not proximate causation:

> The criminal actions of the methamphetamine cooks and those further down the illegal line . . . are 'sufficient to stand as the cause of the injury' . . . and they are 'totally independent' of the Defendants' actions of selling cold medicine to retail stores, . . . even if the manufacturers knew that cooks purchased their products to use in manufacturing methamphetamine.

552 F.3d at 670.  Likewise here, the independent acts of the purveyors of allegedly harmful third-party content—or of third-party content that is "addictive"—stand as the cause of alleged injuries to adolescents from their online interactions.  To hold otherwise would open the door to liability for all kinds of otherwise lawful products and services that may be misused to cause harm.  *Id.* at 671 ("[W]hat of the liability of manufacturers in other industries that, if stretched far enough, can be linked to other societal problems?"); *see also Twitter, Inc., v. Taamneh*, 143 S. Ct. 1206, 1229 (2023) ("[A] contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them.  That conclusion would run roughshod over the typical limits on tort liability[.]").

## V.      THE STATE'S UPA CLAIMS FAIL AS A MATTER OF LAW.

The State's UPA claims are barred in their entirety for the reasons discussed above.  *See supra* Parts I-III.  In addition, the Amended Complaint fails to state a claim under the UPA because (1) Meta is exempt from the UPA under an explicit statutory exemption for entities, like Meta, that engage in the dissemination of information; (2) the State does not and cannot allege that Meta's

provision of free services to its users involves "a sale, lease, rental, or loan of goods or services," as required to state a UPA claim, NMSA 1978, § 57-12-2(D); and (3) the State's allegations regarding Meta's advertisers fall outside of the zone of interests protected by the UPA.  Further, even aside from these threshold bars to the State's UPA claims, many of Meta's alleged "misrepresentations" are not actionable statements of fact, and the State fails to allege that any of Meta's purported omissions are material, as the UPA requires.

### A.        The UPA Exempts Meta from Liability (Counts I, II, & III).

The UPA expressly exempts from liability "publishers, broadcasters, printers or other persons engaged in the dissemination of information or reproduction of printed or pictorial matters who publish, broadcast or reproduce material without knowledge of its deceptive or unconscionable character."  NMSA 1978, § 57-12-16.  Meta falls squarely within this exemption.  Under the State's own allegations, Meta is "engaged in" the "dissemination of information."  As the Complaint alleges, Meta "offers an online social media networking platform that enables users to post and share images and videos with others, as well as interact with other users," FAC ¶ 11, and provides services that allow for the "creation and proliferation of . . . content," *id.* ¶ 29.  *See also, e.g.*, *id.* ¶¶ 76-77, 79, 81, 95, 100, 102-173, 174, 187, 188, 185, 200, 202 (allegations regarding content published on Meta's platforms).

Further, the State does not and cannot allege that Meta disseminated information with "knowledge" of its "deceptive or unconscionable character."  Accordingly, by its plain terms, the UPA exemption applies to Meta's conduct in "the dissemination of information."  For this threshold reason, Meta is exempt from claims under the UPA.[11]

---

[11] The FAC makes conclusory allegation that "Meta's conduct is not that of a publisher, simply presenting content created by others."  ¶ 78.  But this does not alter the fundamental point that the State's allegations of harmful content all concern content generated by third parties, not Meta.  *See,* (continued…)

**B.     The UPA Does Not Apply to Meta's Provision of a Free Service Because There Is No "Sale, Lease, Rental, or Loan of Goods or Services" (Counts I, II & III).**

The State's allegations regarding Meta's users fail to state a claim because the UPA does not apply to the provision of a free service.  By its terms, the UPA applies only to "unfair or deceptive trade practices and unconscionable trade practices."  NMSA 1978, § 57-12-3.  An "unfair or deceptive trade practice" is defined to mean an act or practice "made in connection with the ***sale, lease, rental or loan of goods or services*** or in the extension of credit or in the collection of debts," NMSA 1978, § 57-12-2(D) (emphasis added).  Likewise, the UPA defines the term "unconscionable trade practice" to mean an act or practice "in connection with the ***sale, lease, rental or loan***, or in connection with the offering for sale, lease, rental or loan, ***of any goods or services***."  *Id.* § 57-12-2(E) (emphases added).

The UPA, as relevant here, thus applies only to a "sale, lease, rental or loan" of "any goods or services."  Yet Meta provides its services to users free of charge.  FAC ¶ 31.  For this fundamental reason, the UPA does not apply to Meta's alleged conduct because the use of a free service does not involve a "sale, lease, rental or loan."  *See, e.g., Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 166 P.3d 1091, 1093 (UPA claim requires proof of a "false or misleading representation . . . in connection with the ***sale, lease, rental, or loan of goods or services*** in the regular course of the defendant's business") (emphasis added); *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311 (same); *Daye v. Cmty. Fin. Loan Serv. Centers, LLC*, 280 F. Supp. 3d 1222, 1246 (D.N.M. 2017) (same).[12]

---

*e.g.*, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[I]n analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations.").

[12] Meta's alleged activities in providing services to advertisers (see FAC ¶¶ 35-39) does not trigger the UPA with respect to the State's claims that users were purportedly harmed by Meta's services, because those claims are not based on Meta's advertising service activities (and for the further (continued…)

Although a UPA plaintiff need not in all circumstances purchase directly from the defendant, *Hicks v. Eller*, 2012-NMCA-061, ¶ 20, 280 P.3d 304, 309, the conduct at issue must still occur "in connection with" a "sale, lease, rental or loan" of goods or services to a consumer. *See id.*; NMSA 1978, §§ 57-12-2(D), (E); *Lohman*, 2007-NMCA-100, ¶ 5. Here, the conduct on which the State bases its UPA claims—Meta's admittedly free-of-charge provision of services that allegedly harmed users, *see, e.g.*, FAC ¶¶ 1-3, 360-391, 410-421—cannot establish a claim under the UPA because there is no "sale, lease, rental or loan" of goods or services.

### C.   The State's Allegations Regarding Meta's Advertisers Fail to State a Claim.

After Meta moved to dismiss the State's original Complaint on the grounds—among others—that the UPA does not apply to Meta's provision of a free service to its users (discussed above), the State amended its allegations to assert claims on behalf of out-of-state corporations that advertise on Meta's platforms. *See* FAC ¶ 4 ("Meta has deceived advertisers both about Meta's and advertisers' ability to ensure that paid advertising does not appear with sexually explicit and violent content."); *see also id.* ¶¶ 437-55, 500-01, 516, 538. These new allegations fail to state or support a claim for two reasons. First, the UPA is a ***consumer protection statute*** and does not apply to alleged deceptions between businesses. Second, the State does not have *parens patriae* authority to bring claims on behalf of out-of-state corporations—the only two examples of purported misrepresentations to advertisers alleged in the Complaint. *See id.* ¶¶ 442-454.

#### 1.   The UPA Does Not Apply to the State's Allegations Regarding Meta's Advertisers.

---

reason, addressed in Part C below, that Meta's interactions with advertisers are not subject to the UPA). Likewise, the State's allegations regarding "Facebook Marketplace," FAC ¶ 40, the "Facebook Stars" program, and "Professional" accounts, *id.* ¶ 41-42, do not support its UPA claims because the State does not allege that such programs have any relation to its claims.

The New Mexico Supreme Court has made clear that the UPA is limited to protecting "consumers," and was not "intended . . . to police the marketplace against unfair trade practices generally." *Gandydancer, LLC v. Rock House CGM, LLC*, 2019-NMSC-021, ¶ 9, 453 P.3d 434, 438. In *Gandydancer*, a railway contractor brought a UPA suit against a competitor, alleging that the competitor made false or misleading statements to the plaintiff's employees regarding the competitor's licensure status. *See id.* at 437. The New Mexico Supreme Court held that the contractor's claims should have been dismissed on the pleadings, because alleged business-to-business misconduct does not fall within the "zone of interests" protected by the UPA. *Id.* at ¶ 8. As the court noted, the legislative history of the UPA "evinces an intent to limit the zone of interest protected from unfair trade practices by the UPA to ***consumers, not [business-to-business] competitors***." *Id.* at ¶ 20. (emphasis added). Thus, as the Court further noted, "New Mexico cases have historically interpreted the UPA to focus ***exclusively on consumer protection***, protecting 'innocent consumers.,'" *Id.* at ¶ 29. (emphasis added).

Other New Mexico courts, and federal courts applying New Mexico law, have likewise consistently recognized that the UPA is a ***consumer*** protection statute. *See, e.g.*, *State v. B&B Inv. Grp.*, 329 P.3d 658, 675 (D.N.M. 2014) (describing the "consumer-protective legislative purpose of the UPA"); *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 30, 227 P.3d 73, 81-82 (describing the "remedial consumer protection purposes of the UPA," and the objective to "ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers"); *Albuquerque Cab Co. v. Lyft*, 460 F. Supp. 3d 1215, 1222 (D.N.M. 2020) ("the UPA is a consumer protection statute"). In fact, this Court in *Guidance Endontics v. Dentsply International* stated that "the very nature" of the UPA is "to protect consumers," which "implies that ***only a consumer***

***should be able to take advantage of its protections***."  708 F. Supp. 2d 1209, 1256 (D.N.M. 2010) (emphasis added).

Here, the State's allegations regarding Meta's advertisers fail to state a claim under the UPA because any such claim would seek not to protect consumers, but to police alleged business-to-business misconduct.  *See, e.g.*, FAC ¶ 442-48 (alleging Meta made false/misleading statements to The Match Group); *id.* ¶¶ 449-454 (alleging Meta made false/misleading statements to Walmart). Such a claim falls outside the "zone of interests" of the UPA.  *See, e.g.*, *Gandydancer*, 2019-NMSC-012, ¶ 24 ("The Legislature intended the UPA to serve as remedial legislation for consumer protection."). Because these allegations do not seek to enforce any consumer protection interest, they fail to state a claim under the UPA as a matter of law.  As this Court stated in *Guidance Endontics*, the State's claim on behalf of advertisers exceeds the scope of the UPA because "only a consumer should be able to take advantage of its protections."  708 F. Supp. 2d at 1256.

### 2.    The State Does Not Have *Parens Patriae* Authority to Bring Claims on Behalf of Out-of-State Corporations.

The State's UPA claims based on Meta's purported misrepresentations to two out-of-state advertisers—Walmart (an Arkansas company) and The Match Group (a Texas company)—should also be dismissed for a separate, independent reason:  the State does not have *parens patriae* standing to bring suit on their behalf.  In its role as *parens patriae*, the State may bring an action under the UPA only to the extent the alleged conduct "directly or indirectly affect[s] the people of [New Mexico]."  NMSA 1978, § 57-12-2 (defining "trade or commerce" for purposes of the UPA); *id.* § 57-12-3 (restricting UPA claims to conduct affecting "trade or commerce").  The Attorney General, moreover, may bring an action to enforce the UPA only consistent with his statutory authority to appear "on behalf of the state" and "when . . . the public interest of the state requires" such

appearance.  NMSA 1978, § 8-5-2(J); *see id*. § 57-12-8 (action to enforce the UPA must "be in the public interest").

These constraints, codified in New Mexico law, are consistent with the traditional function of *parens patriae* standing, where a state may "bring suit to protect the interests of ***its citizens***, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity." *Texas v. United States*, 86 F. Supp. 3d 591, 625 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (emphasis added).  "In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign interest."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982); *see also BP Am., Inc. v. Oklahoma ex rel. Edmondson*, 613 F.3d 1029, 1031 n.* (10th Cir. 2010) (citing *Alfred L. Snapp*); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1182 (D.N.M. 2020) (same).

Here, the State cannot satisfy this requirement for *parens patriae* standing insofar as it asserts claims on behalf of out-of-state companies allegedly harmed by Meta's purported misrepresentations.  Courts recognize the concept of "quasi-sovereign" interests as grounds for *parens patriae* standing in order to ensure that states are able to protect the interests ***of their own resident citizens***.  *See*, *e.g.*, *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 161 (E.D.N.Y. 2017), *aff'd in part and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ("[T]o be 'quasi-sovereign,' the state's interests must be sufficiently generalized that the state is seeking to vindicate ***its citizens'*** welfare, rather than simply pressing suit on behalf of its individual residents." (emphasis added)); *Alfred L. Snapp*, 458 U.S. at 593 ("The State must express a 'quasi-sovereign' interest . . . of ***its residents in general***." (emphasis added)); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 259 (1972) (holding that "Hawaii may maintain its lawsuit

on behalf of *its citizens*" (emphasis added); *Pfizer, Inc. v. Lord*, 522 F.2d 612, 616 (8th Cir. 1975) (noting that over time "[p]arens patriae prerogatives were expanded to include the right of a state to sue for the general welfare of *its citizens at large*" (emphasis added)); *McAleenan*, 450 F. Supp. 3d at 1183 ("A State has a quasi-sovereign interest in *its citizens'* general health and well-being -- both physical and economic." (internal quotation omitted) (emphasis added)).

In bringing claims under the UPA on behalf of Meta's advertisers, the State fails to assert any quasi-sovereign interest on behalf of any citizen of New Mexico, much less on behalf of New Mexico's citizens *writ large*. The Amended Complaint alleges that "Meta has deceived advertisers both about Meta's and advertisers' ability to ensure that paid advertising does not appear with sexually explicit and violent content." FAC ¶ 4. But the State does not allege any "deception" of *New Mexico*-based advertisers; the only factual allegations regarding any purported misrepresentations to advertisers involve two out-of-state corporations. *See* FAC ¶¶ 442-54.

The State cannot establish and does not even allege that it has a quasi-sovereign interest in asserting misrepresentation claims on behalf of two large, out-of-state companies relating to their commercial dealings with Meta. For this fundamental reason, the State lacks *parens patriae* authority to assert these claims because it is not "seeking to vindicate its *citizens'* welfare." *Batalla Vidal*, 295 F. Supp. 3d at 161 (emphasis added). The economic interests of Walmart or The Match Group in how their advertising is displayed on Meta's services—and whether Meta has made misrepresentations about the display of that advertising—are entirely removed from the interests of New Mexico citizens that can support *parens patriae* standing. *See Alfred L. Snapp*, 458 U.S. at 602 (quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its *populace*") (emphasis added).

**D.      The State Fails to Allege Actionable Misrepresentations (Counts I & II).**

New Mexico courts have recognized that an "essential element[]" of a UPA claim for unfair or deceptive trade practices is that "the defendant made an oral or written statement, a visual description or a representation of any kind that was either ***false or misleading***." *Hicks*, 2012-NMCA-061, ¶ 18, 280 P.3d at 308 (emphasis added); *see also Andrews v. Stallings*, 1995-NMCA-015, ¶ 21, 892 P.2d 611, 619 (a statement of fact is something plaintiff could theoretically "prove to be false"). Statements of opinion or generalized objectives, which courts often refer to as non-objective "puffery," are not actionable under the UPA. *See, e.g.*, *Dollens v. Wells Fargo Bank, N.A.*, 2015-NMCA-096, ¶ 16, 356 P.3d 531, 537 (noting that "non-actionable puffery" cannot form the basis of a claim under the UPA).

Many of the statements the State identifies as purported "misrepresentations" are not statements of fact at all. As a preliminary matter, the Complaint repeatedly alludes to purported representations made by Meta without describing the alleged representations in any detail. *See* FAC ¶ 188 (asserting without citation or attribution "Facebook's claims to be safeguarding its platforms"); *id.* ¶ 204 ("This is particularly problematic in a context in which Meta has repeatedly assured its users and the public that all is well with regard to CSEC on its platforms."); *id.* ¶ 255 ("While Meta promised to safeguard the health and safety of children on its platforms . . . it made decisions that put its own profits ahead of their well-being."); *see also id.* ¶¶ 206, 210, 245. These conclusory allegations cannot state a claim because they do not identify the alleged misrepresentation with even minimal detail. *See, e.g.*, *Twombly*, 550 U.S. at 570.

Further, many of the specific "misrepresentations" the Complaint purports to identify cannot support its UPA claims:

**Statements Regarding Safety.** The State bases the core of its claim that Meta engaged in "deceptive trade practices" (Count I) on allegations that Meta claimed its services were "safe" for

young users. *See, e.g.*, FAC ¶ 1 ("Meta and its CEO tell the public that Meta's social media platforms are safe and good for kids. The reality is far different."); *id.* ¶ 75 ("Its executives uniformly proclaim Meta's commitment to safety in interviews and posts on Meta's website."); *id.* ¶ 79 ("None of the content below . . . is consistent with Defendants' Meta's and Zuckerberg's representations that Meta maintains an environment that is safe for children[.]"). But the statements the State identifies are statements of opinion or generalized, non-quantifiable objectives or aspirations, not actionable statements of fact. For example, the State cites (1) Facebook posts by Mark Zukerberg expressing his opinion that "it's very important to me that everything we build is safe and good for kids," *id.* ¶ 212, and that "[w]e care deeply about issues like safety, well-being and mental health," *id.* ¶ 423(h); (2) a statement by an unnamed Facebook spokesperson that Meta "take[s] human trafficking very seriously and a number of measures are in place to counter this activity," *id.* ¶ 423(a); (3) a statement by a Meta employee that "[m]aking the community a safer place, a place where people feel good, is a huge priority for Instagram . . . I would say one of the top priorities," *id.* ¶ 423(b); (4) a statement by a Meta executive that "[w]hile we continue to invest in helping businesses, we are equally focused on keeping our platform safe," *id.* ¶ 423(d); (5) an opinion of a Meta executive that "Instagram's effects on the wellbeing of teenagers and adolescents was 'quite small,'" *id.* ¶ 423(f); and (6) statements allegedly made to Meta's advertisers regarding the safety of its platforms, *id.* ¶ 438 ("[Meta] represents that Meta has 'policies and processes in place to keep our platform safe from harmful content as well as content that is considered unsuitable to our advertising partners.'"), among others, *see id.* ¶¶ 423(c), (i), 425-26.

Such statements cannot form the basis for a misrepresentation claim under the UPA because they are not quantifiable and cannot be proven false. For this reason, courts routinely dismiss misrepresentation claims based on generalized or non-objective statements about "safety." *See, e.g.*,

*In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020) ("generalized assertions about Lyft's commitment to safety, its safety measures, and the role safety plays in the rideshare market" were "non-actionable puffery"); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (statements about "quality [and] safety" were nonactionable opinions); *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015) (statement that Uber is the "safest ride on the road" was "non-actionable puffery"); *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 183–84 (E.D.N.Y. 2016) (similar, for statement about "mak[ing] Uber the safest experience"); *Cooke v. Allstate Mgmt. Corp.*, 741 F. Supp. 1205, 1216 (D.S.C. 1990) (a "judgment and opinion about safety" "is certainly not the kind of statement [the] law would support as fraudulent").

The decision in *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) demonstrates this point.  There, the plaintiffs alleged that Yahoo's statement that "protecting our systems and our users' information is paramount" was misleading because Yahoo allegedly knew and did not disclose the risks of a breach of users' personal data, and then did not disclose actual data breaches after they occurred.  *Id.* at *2-4, 26.  The court dismissed the plaintiffs' consumer protection claims, holding that the statement was not a misrepresentation because it "is a vague and 'all-but-meaningless superlative[ ]' regarding how Defendants' prioritize the safety of their systems and their users' information." *Id.* at *26 (citation omitted).  The same reasoning applies here.  Meta's generalized, unmeasurable claims of prioritizing user "safety" or "well-being" are not statements of objective fact and therefore cannot be actionable as misrepresentations, as a matter of law.

**Prevalence of Harmful Content.**  The State similarly fails to allege that Meta's statements that users "did not encounter significant levels of harmful content'" were deceptive.  FAC ¶ 500(a).

This allegation rests on Meta's published Community Standard Enforcement Reports ("CSER"), which "provide metrics on how [Meta] enforced [its] policies . . . and estimates on the amount of violating content (Prevalence) on Facebook and Instagram." *Id.* ¶ 406.  The State claims the CSER's rates are false because a subjective user-survey conducted by Meta—the Bad Experiences & Encounters Framework ("BEEF")—purportedly showed higher rates of users self-reporting exposure to perceived harmful content. *Id.* ¶¶ 198, 266-69, 411.

The State's allegations, accepted as true, cannot establish a misrepresentation.  The CSER and BEEF involve entirely different data—the CSER measures the percentage of ***views*** of content that violates Meta's content standards, whereas BEEF reports the percentage of ***users*** who self-report having seen content they believe fall into certain inherently subjective and undefined categories of "harmful content." *Id*. ¶¶ 206, 285-88, 426-431, 480-81.  As the State itself alleges, "there is a material gap between [the CSER's] narrow definition of prevalence and the actual distressing experiences that are enabled by Meta's" services. *Id.* ¶ 398.  That admission defeats allegations of misrepresentation, because as the State alleges, the BEEF data do not measure the same objective prevalence data as the CSER, and therefore do not contradict it.  Put simply, users may report in a survey that they viewed what they describe as harmful content, even though that content may not— and often does not—violate Meta's community standards.  The State's allegations regarding BEEF therefore do nothing to establish that the challenged statements regarding the CSER are false or misleading.[13]  *See Cullen v. Netflix, Inc.*, 2013 WL 140103, at *7 (N.D. Cal. Jan. 10, 2013), *aff'd*, 600 F. App'x 508 (9th Cir. 2015) (misrepresentation-based consumer protection claims failed

---

[13] Meta disputes the implication that its community standards are in any way inadequate, or that the BEEF data are better reflections of the prevalence of harmful content than the CSER. Moreover, to the extent the State suggests that Meta's content moderation policies are insufficient, any such claim would clearly be barred by Section 230 and the First Amendment. *See supra* Sections II-III.

because "[a]t the heart of Plaintiff's claims . . . lies a discrepancy between the ways he and Defendant claim to calculate" the metric at issue, and thus the defendant's "statements . . . do not appear to be false").

      **Other Non-Actionable Statements.**  Other alleged misrepresentations the State identifies also cannot support a UPA claim because—even accepting the State's allegations as true—the State fails to adequately allege that Meta's statements were false.  For example, the State repeatedly cites statements that Meta does "not allow content or activity that sexually exploits or endangers children." *E.g.*, FAC ¶ 75; *see also id.* ¶ 423(g) ("Sex trafficking and child exploitation are abhorrent and we don't allow them on Facebook.").  But while the State alleges that Meta does not do enough to eliminate the presence of such material on its services, *see, e.g.*, FAC ¶¶ 76-77, 79, 81, 95, 100, 102-173, 174, 187, 188, 195, 200, 202, it has not alleged that Meta's statements regarding its policies prohibiting such conduct were untruthful.  The presence of such content on Meta's apps—content posted by third parties—is not inconsistent with Meta's truthful statements that its policies prohibit "content or activity that sexually exploits or endangers children."  *Id.* ¶ 75.  Just as a store policy prohibiting shoplifting is not proven false by an episode of shoplifting, the allegation that a user of Meta's services violated Meta's policies does not disprove those policies' existence.

      The State similarly cites to statements that Meta removes content that violates its policies. *See, e.g.*, FAC ¶ 423(e).  But the State concedes that Meta ***does*** remove such content when it becomes aware of it.  *See id.* at ¶¶ 178, 187, 191, 195, 200.  Again, the State's allegations that Meta did not do enough to enforce its policies do not establish that Meta was untruthful in stating that it had those policies in place.

      **E.**    **The State Has Not Alleged that Any Purported Omissions Were Material (Counts I & II).**

The State also alleges that Meta engaged in misrepresentations by omission.  *See* FAC ¶¶ 317, 379, 391, 431-435.  But merely alleging that Meta omitted a fact is not sufficient to state a claim; the UPA applies only when a defendant has failed to state a ***material fact***.  NMSA 1978, § 57-12-2(D)(14); *see also Dollens v. Wells Fargo Bank, N.A.*, 2015-NMCA-096, ¶ 14, 356 P.3d 531 ("the UPA imposes an affirmative duty to disclose material facts reasonably necessary to prevent any statements from being misleading") (quotation omitted)).

An omission is "material" if "a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action."  *Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 72, 68 P.3d 909, 930 (quoting Restatement (Second) of Torts § 538(2)(a)(b)).  In other words, as relevant here, an omission is not material unless it would have been important to a user's decision to use Meta's services or a corporation's decision to advertise on Meta's platforms.

Here, although the State alleges that several omissions of fact by Meta rose to the level of misrepresentations, FAC ¶¶ 317, 379, 391, 431-435, it fails to allege facts that would establish that any such omissions were material to Meta's users.  Accordingly, none of the purported omissions alleged by the State can establish a claim under the UPA.

## CONCLUSION

For the foregoing reasons, Meta respectfully requests that the State's Complaint be dismissed with prejudice in its entirety.

January 23, 2024                          By: */s/ John C. Anderson*

                                         John C. Anderson
                                         Olga M. Serafimova
                                         HOLLAND & HART LLP
                                         110 N. Guadalupe Street, Suite 1
                                         Santa Fe, NM 87501
                                         Telephone: (505) 988-4421
                                         jcanderson@hollandhart.com
                                         omserafimova@hollandhart.com

Nathan E. Shafroth (*Pro Hac Vice*)
nshafroth@cov.com
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-6000
nshafroth@cov.com

Timothy C. Hester (*Pro Hac Vice*)
thester@cov.com
Covington & Burling LLP
One CityCenter 850 Tenth Street, NW ·
Washington, DC 20001-4956
Telephone: +1 (202) 662-6000
thester@cov.com

*Attorneys for Defendants Meta Platforms, Inc.,
Instagram, LLC, Meta Payments, Inc., and Meta
Platforms Technologies, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 23, 2024, a copy of the foregoing was filed through the court's CM/ECF system, causing it to be served by electronic mail upon the following:

James W. Grayson
Chief Deputy Attorney General
Raul Torrez, Attorney General of New Mexico
New Mexico Attorney General's Office
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Phone: (505) 218-0850
Email: jgrayson@nmag.gov

Serena R. Wheaton
Assistant Attorney General
New Mexico Attorney General's Office
Consumer & Environmental Protection Division
201 Third Street NW, Suite 300
Albuquerque, NM 87102
Phone: (505) 490-4846
Email: swheaton@nmag.gov

Linda Singer
David I. Ackerman
Motley Rice LLC
401 9th Street NW, Suite 630
Washington, DC 20004

Email: lsinger@motleyrice.com
Email: dackerman@motleyrice.com

*/s/ John C. Anderson*
John C. Anderson

31293240_v2